**THE GOOD NEWS CLUB, Andrea Fournier and Darleen Fournier, Plaintiffs–Appellants,**

v.

**MILFORD CENTRAL SCHOOL, Defendant–Appellee.**

**Docket No. 98–9494.**

United States Court of Appeals, Second Circuit.

Argued: June 23, 1999

Decided: Feb. 03, 2000

Thomas J. Marcelle, Slingerlands, NY, for Plaintiffs–Appellants.

Frank W. Miller, Ferrera, Fiorenza, Larrison, Barrett & Reitz, East Syracuse, N.Y., for Defendant–Appellee.

(Jay Worona, New York State School Boards Association, Inc., Albany, NY) for the New York State School Boards Association, Inc., as amicus curiae.

Before: JACOBS, MINER and PARKER, Circuit Judges.

Judge JACOBS dissents in a separate opinion.

MINER, Circuit Judge:

Plaintiffs-appellants The Good News Club (the "Club"), Darleen Fournier, and her seven-year-old daughter Andrea,[1] appeal from a summary judgment entered in the United States District Court for the Northern District of New York (McAvoy, C.J.) in favor of defendant-appellee Milford Central School ("Milford" or "the school"). The action was brought to secure access to school premises for the purpose of conducting Club meetings, and the complaint contains demands for monetary as well as injunctive relief. The Club's claims are bottomed, inter alia, on the right to free speech under the First and Fourteenth Amendments. The district court found that the Club's activities were properly characterized as religious instruction and prayer and not the teaching of values or morals from a religious viewpoint. Accordingly, the court concluded that the school could properly exclude the Club because it had not opened its facilities for religious instruction or prayer.

For the reasons that follow, we affirm.

## BACKGROUND

In August of 1992, the Milford Central School District adopted a policy (the "Community Use Policy" or the "Policy") pursuant to § 414 of the New York State Education Law that governs the conditions under which outside organizations may utilize school facilities. The Community Use Policy provides that district residents may use school facilities for "holding social, civic and recreational meetings and entertainment events and other uses pertaining to the welfare of the community, provided that such uses shall be nonexclusive and shall be open to the general public," and otherwise consistent with state law. The Policy expressly forecloses use for reli-

gious purposes and requires that applicants certify that their proposed use complies with the Policy:

> School premises shall not be used by any individual or organization for religious purposes. Those individuals and/or organizations wishing to use school facilities and/or grounds under this policy shall indicate on a Certificate Regarding Use of School Premises form provided by the District that any intended use of school premises is in accordance with this policy.

Under the Community Use Policy, the school has allowed a number of organizations to use its facilities, including the Boy Scouts, the Girl Scouts, and the 4–H Club.

The Good News Club is a community-based Christian youth organization open to children between the ages of six and twelve. The Club takes its name from the "good news" of Christ's gospel and the "good news" that salvation is available through belief in Christ. The purported purpose of the Club is to instruct children in moral values from a Christian perspective. It is affiliated with an organization known as Child Evangelism Fellowship ("CEF"), a Christian missionary organization that oversees and provides support to chapters of The Good News Club throughout the country. Among other things, the CEF provides teaching materials, prayer booklets for distribution called the "Daily Bread" and training to Club leaders.

A typical Club meeting begins when the participating children, who range from kindergarten-age to sixth graders, arrive at the meeting site. If a child remembers the "memory verse" from the previous week's meeting, she may recite it and is rewarded with a prize. The meeting officially opens with a prayer led by Reverend Stephen Douglas Fournier[2] that gives

---

**1.** For convenience, except where necessary for clarity, plaintiffs are collectively designated as "the Club" throughout this opinion.

**2.** Reverend Fournier is the husband of plaintiff-appellant Darleen Fournier, the father of

plaintiff-appellant Andrea Fournier, and the pastor of Milford Center Community Bible Church. He is not a party to this action but describes himself as a "teacher" for the Club.

thanks and entreats God for His blessing on the meeting. The group then sings the Good News Club theme song, the lyrics of which refer to Jesus Christ and are generally "about . . . good news."

The next segment of a Club meeting involves a "moral or value" lesson centered around a verse from either the Old or the New Testament and its teaching. To learn the "memory verse" for the lesson, the Club members play games that focus on repetition of the verse. Next, the children are told a Bible story that emphasizes the same moral value that is represented in the day's memory verse. The story concludes with a "challenge and invitation" segment, which challenges the children to live by the value taught in the day's lesson through trust in God and Jesus Christ. Depending on the elapsed time, when the story is concluded, the group leader may ask the children questions about the story or play a game that emphasizes the teaching in the story. The group may also sing a song that relates to the story.

The record includes a number of specific lesson plans provided by CEF for conducting Club meetings.[3] One such lesson, taught by Darleen Fournier according to the lesson plan, is entitled "Israel Demands a King" from the series "David: A Man after God's Heart." The teaching of the lesson is centered around a verse from Ephesians 5:17, "[w]herefore be ye not unwise, but understanding what the will of the Lord is." According to the materials, the "teaching objective" is that "[t]he

saved child will desire God's best, allowing God to have first place in his life" and the "main teaching" is to "[g]ive God first place in your life."

The lesson plan distinguishes in the application of the memory verse between those children who are "saved" and those who are "unsaved." The lesson applies to the saved in that "[i]f you have believed on the Lord Jesus as your Savior, one of the wisest decisions you can make is to give God first place in your life. Do and say those things that will please Him." As for the unsaved, "[i]f you have never believed on Jesus to save you from sin, you can be sure this is the wisest and most important decision you will ever make. You will be given an opportunity later in class today to believe on Jesus." [4]

The story in "Israel Demands a King" centers around events recounted in I Samuel 8–10, wherein the elders of Israel requested that Samuel appoint a king over them, contrary to God's will. Notwithstanding Samuel's warning of dire consequences, the people insisted that a king be appointed, and Samuel was directed by God to anoint Saul as the new king. Though Saul accepted the role as king, Samuel "felt sad for his people who had rejected God as their King. He knew this was not the best way. It could only lead to sorrow and trouble for them."

"Israel Demands a King" includes the following "Challenge and Invitation" segment:

---

3. The materials from CEF contain, in their introduction, a list entitled "How to Lead a Child to Christ," which includes the following directives:

1. Show him his NEED of salvation; that all persons are not going to Heaven; that no one in himself is good enough to go and the result of sin is forever separation from God (Romans 3:23; Revelation 21:27; John 8:21, 24).
2. Show him the WAY of salvation. Salvation is a free gift because the Lord Jesus took our place on the cross, was buried and rose again from the dead (John 3:16; Ephesians 2:8; 1 Corinthians 15:3–4).

3. Lead him to RECEIVE the gift of salvation, even Jesus Christ, by trusting Him as his personal Savior (John 1:12; Revelation 3:20).
4. From the Word of God, help him find ASSURANCE of his salvation (John 3:36; Revelation 3:20; Hebrews 13:5).
5. Lead him to CONFESS Christ (Matthew 10:32). This confession should be made to you, other workers, later to his friends and as circumstances permit, in a public church service.

4. The emphasis for "unsaved" children is the same in each lesson plan: to accept Jesus Christ as their savior.

## CHALLENGE

If you have believed on the Lord Jesus, trusting Him to save you, will you remember this week that God's best for you is to give Him first place in your life? When you are tempted to allow other things to take over that special place, will you stop and think about all God has done for you? Remember what our memory verse says. *(Say Ephesians 5:17 together.)* Don't be foolish like the people of Israel, but understand that God's will for you is that you be a person after His own heart, giving Him first place in your life. If you have been allowing other things to have first place, confess that sin to God. Ask Him to help you keep Him first.

I have a slip of paper with a number one printed on it that says, "Keep God first this week!" You could put this paper on your mirror, by your bed or on your locker door at school. Let it be a reminder to you all week long to give God first place in your life.

## INVITATION

God cannot be first in your life until you believe on Him as your Savior from sin. If you are willing to admit to God that you have sinned, and you believe that the Lord Jesus suffered and died to take the punishment for your sin and came alive again, you can be saved today. The Bible says, "Believe on the Lord Jesus Christ, and thou shalt be saved" (Acts 16:31). Will you believe on Him, trusting Him to save you? You can talk to the Lord right now. Say something like this: "Dear Lord Jesus, I do believe You died for me. I'm sorry for the wrong things I've done. Please take away my sin and help me obey You. Thank You for saving me today." *(Ask those who prayed this prayer to meet you in a designated place after class so you can answer any questions they may have. Remind the children that if they did not pray now, they can talk to the Lord even after they leave.)*

After the story, if time permits, the group leader shares a "missionary story" with the children, which is described by Reverend Fournier as a "fictitious stor[y] that deal[s] with some part of the world where missionary activity is going on."[5] After the missionary segment, the group leader may play another game with the children and may award prizes based on recitation of the memory verse and on their performance in the games. If time allows, the group may sing another song. At various times throughout the meeting, the group may pray for "CEF missionaries" and to "receive Jesus as [a child's] personal Savior." The meetings adjourn after approximately one hour. In the course of the meeting, children are invited to meet with Darleen Fournier privately after the meeting for individual discussion and prayer.

During the 1995–96 school year and into the fall of 1996, the Good News Club held its meetings at the Milford Center Community Church. During that time, the school provided bus transportation for some of the children and parents provided transportation for other children. In September of 1996, however, the school ceased providing bus service from the school to the church, which meant that some children were unable to attend Club meetings.

Consequently, in September of 1996, Darleen Fournier, on behalf of the Good News Club, submitted a standard District Use of Facilities Request Form (the "Form") to Dr. Robert C. McGruder, Interim Superintendent of Schools in the Milford School District. The Form stated that the proposed use of the school's facili-

---

**5.** The missionary stories "have to do with spreading the gospel." Reverend Fournier described one such story as follows:

The missionary story for this quarter was of two young Haitian boys, one boy ... goes to a Bible study and he invites the other boy to that Bible study, and that boy ends up going and the conflict that it causes with his father ... in the end the father ends up going as well.

ties was to have "a fun time of singing songs, hearing [a] Bible lesson and memorizing scripture." A few days after the request, Superintendent McGruder received a second request on behalf of the Good News Club from Reverend Fournier. On October 3, 1996, McGruder denied the requests in a letter, articulating that he understood the Good News Club's proposed use of the facilities to be "the equivalent of religious worship ... rather than the expression of religious views or values on a secular subject matter."

On January 7, 1997, counsel for the Good News Club wrote to McGruder, asserting that McGruder's denial of access was in violation of the Club's "right to free speech, its right to equal protection of the law, and its rights under the Restoration of Religious Freedom Act," and noting that the school had previously allowed "other groups such as the Girl Scouts to use school facilities." The Club's attorney promised to bring suit if the school did not reverse its position and allow the Good News Club to use school facilities. Three days later, Milford's counsel requested materials to further clarify the nature of the instruction and activities that would take place at a Club meeting. The Club's counsel responded in a letter dated January 17, 1997, which contained the following description:

> The Club opens its session with Ms. Fournier taking attendance. As she calls a child's name, if the child recites a Bible verse the child receives a treat. After attendance, the Club sings songs. Next[,] Club members engage in games that involve, *inter alia*, learning Bible verses. Ms. Fournier then relates a Bible story and explains how it applies to Club members' lives. The Club closes with prayer. Finally, Ms. Fournier distributes treats and the Bible verses for memorization.

The following week, the Good News Club's counsel forwarded a set of materials used or distributed by the Club. Among the materials submitted were a Good News Club invitation printed on an index card, a parental permission slip, a sample puzzle, and a copy of the "Daily Bread." This issue of the Daily Bread contained stories that refer to the second coming of Christ, accepting the Lord Jesus as the Savior, and believing in the Resurrection and in the descent of the Lord Jesus from Heaven.

After a review of the materials, Superintendent McGruder and counsel determined that "the kinds of activities proposed to be engaged in by the Good News Club [a]re not a discussion of secular subjects such as child rearing, development of character and development of morals from a religious perspective, but were in fact the equivalent of religious instruction itself." On February 26, 1997, the Milford Board of Education adopted a resolution denying the Good News Club's request to use its facilities during the pendency of *Bronx Household of Faith v. Community School District No. 10*, 127 F.3d 207 (2d Cir.1997). The substance of this resolution was transmitted to the Good News Club by letters dated February 28, 1997 and March 3, 1997. The Good News Club filed a complaint in the United States District Court for the Northern District of New York on March 7, 1997, alleging claims under 42 U.S.C. § 1983 for deprivation of its rights to free speech under the First and Fourteenth Amendments, its right to equal protection under the Fourteenth Amendment, and its right to religious freedom secured by the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.* The Good News Club sought injunctive relief, damages and attorneys' fees.

On April 14, 1997, the district court preliminarily enjoined the school from enforcing its ban on the Club's use of school facilities. The court reasoned that there were sufficiently serious questions regarding the parties' understanding of the content of the Club's meetings to justify the injunction. On August 3, 1998, the parties cross-moved for summary judgment and, on September 25, 1998, stipulated to the

facts of the case. In a Memorandum–Decision and Order dated October 23, 1998, the district court addressed the parties' cross-motions. The court began its analysis by noting that the First Amendment does not guarantee unbridled access to public property but that access to such property depends on the character of the property at issue and the nature of the proposed use. Given the dictates of New York Education Law § 414 and our previous decisions on the subject, the court concluded that the Milford school was a limited public forum. The court next considered whether the restrictions in the limited public forum passed constitutional muster, *i.e.*, whether they were reasonable and viewpoint neutral.

After an extensive review of the purposes of and activities associated with the Good News Club, the court concluded that the Club's activities constituted religious instruction and prayer. The court determined that the school had not previously allowed a group to use its facilities for religious instruction or prayer and that the Club's attempted comparisons to the Boy Scouts, the Girl Scouts, and the 4–H Club were unpersuasive. In this regard, the court noted that, although the Boy Scouts "teach reverence and a duty to God," this was "only a part of its overall purpose[,] which is ... personal growth and development of leadership skills." Because the court found that the Club is a religious youth organization that proposed religious instruction and prayer and not an organization seeking to teach morals from a religious perspective, it dismissed the Club's free speech claim. The court thereafter dismissed the Club's equal protection claim under the authority of *Bronx Household of Faith*, 127 F.3d at 217 and entered judgment on October 23, 1998.[6] This appeal followed.

**6.** The court dismissed the Club's RFRA claim as moot in light of *City of Boerne v. Flores*, 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

## DISCUSSION

■ We review the district court's grant of summary judgment *de novo*. *See Johnson v. Wing*, 178 F.3d 611, 614 (2d Cir. 1999).

On appeal, the Good News Club presses as its sole contention that the First Amendment dictates that the Club cannot constitutionally be excluded from use of the Milford Central School facilities.[7] It argues that it seeks to use the facilities to teach morals and values, just as other organizations have done in school facilities. Thus, it asserts, to exclude the Club because it teaches morals and values from a Christian perspective constitutes unconstitutional viewpoint discrimination.

■ The nature of permissible limitations on speech is based on "the nature of the forum in which the speech is delivered." *Bronx Household of Faith*, 127 F.3d at 211. There are three general types of forums in this regard: (1) traditional public forums, (2) designated or limited public forums, and (3) non-public forums. *See Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Limited public forums are those that the government has designated as a "place ... of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Bronx Household of Faith*, 127 F.3d at 211 (quotation omitted). We have previously held on a number of occasions that N.Y. Education Law § 414 and policies promulgated thereunder create limited public forums. *See, e.g., Full Gospel Tabernacle v. Community Sch. Dist. 27*, 164 F.3d 829, 829 (2d Cir.1999) (per curiam), *aff'g* 979 F.Supp. 214, 220 (S.D.N.Y.1997); *Bronx Household of Faith*, 127 F.3d at 215; *Deeper Life Christian Fellowship, Inc. v. Board of Educ.*, ("*Deeper Life I*") 852 F.2d 676, 680

**7.** The Club has abandoned its equal protection and RFRA claims on appeal.

(2d Cir.1988). Milford's Community Use Policy specifies who may use school facilities, when, and for what purposes. The parties agree, as they did in the court below, that the Milford school has created a limited public forum. In light of our precedent, the district court's conclusion, and the parties' agreement, we think it clear that the Community Use Policy has created a limited public forum in the Milford school facilities.

■■ Restrictions on speech in a limited public forum will withstand First Amendment challenge if they are reasonable and viewpoint neutral.[8] *See Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 829–30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Bronx Household of Faith,* 127 F.3d at 214. On appeal, the Good News Club challenges the application of both of these criteria. Taking first the reasonableness criterion, the Club argues that the restriction is unreasonable because Milford's articulated purpose for the restriction—"ensuring that students in its charge are not left with the impression that [it] endorses religious instruction in its school, or that it advances the beliefs of a particular religion or group thereof"—is unpersuasive. It argues that there is little risk that children would confuse the Club's use of school facilities with the school's endorsement of the religious teachings.

This argument is foreclosed by precedent. In *Bronx Household of Faith,* we stated that "it is a proper state function to decide the extent to which church and school should be separated in the context of the use of school premises." 127 F.3d at 214. Furthermore, "it is reasonable for state legislators and school authorities to avoid the identification of a ... school with a particular church." *Id.* Although we made this pronouncement in the context of an organization requesting to conduct church services in a school, we believe it is equally applicable to the case now before us. The Club argues that it is not a "particular church," but rather a nondenominational Christian organization. This difference, however, is immaterial. The activities of the Club clearly and intentionally communicate Christian beliefs by teaching and by prayer, and we think it eminently reasonable that the Milford school would not want to communicate to students of other faiths that they were less welcome than students who adhere to the Club's teachings. This is especially so in view of the fact that those who attend the school are young and impressionable.

The crux of the Good News Club's argument is that the Milford school's application of the Community Use Policy to exclude the Club from its facilities is not viewpoint neutral. In this regard, the Club posits that it is teaching moral values, just as the Boy Scouts, Girl Scouts, and the 4–H Club do. The Club contends that, unlike those organizations, it has been excluded because it seeks to teach these moral values from a Christian viewpoint. Though such teachings may involve secular values such as obedience or resisting jealousy, the Christian viewpoint, as espoused by Reverend Fournier, contains an additional layer:

> [T]hese morals or these values are senseless without Christ, that's to the children who know Christ as Savior, we would say, you know you cannot be jealous because you know you have the strength of God. To the children who do

8. Milford argues that our inquiry should end with the observations that (1) the denial of permission to use school facilities was pursuant to the Community Use Policy and N.Y. Education Law § 414, and (2) § 414 has always been upheld as constitutional. In this regard, Milford presumes what it needs to prove: by their terms, § 414 and the Community Use Policy do not allow use of school facilities for religious purposes. *See, e.g., Deeper Life Christian Fellowship, Inc. v. Sobol,* ("*Deeper Life II*") 948 F.2d 79, 84 (2d Cir. 1991). If the Club's use is not a "religious use" but merely the teaching of morals from a religious viewpoint, however, Milford's exclusion of the Club would not comply with § 414 and its Community Use Policy and would be unconstitutional viewpoint discrimination.

not know Christ, we would say, you need Christ as your Lord and Savior so that you might overcome these, you know, feelings of jealousy.[9]

We conclude, as did the district court, that the Good News Club is doing something other than simply teaching moral values. As we stated in *Bronx Household of Faith*, it "is not difficult for school authorities to make" the distinction between the discussion of secular subjects from a religious viewpoint and the discussion of religious material through religious instruction and prayer. 127 F.3d at 215. Although other cases may present difficult questions of line-drawing, we believe that the school authorities, after thorough inquiry and deliberation, correctly determined that the activities of the Club fall clearly on the side of religious instruction and prayer.

The activities of the Good News Club do not involve merely a religious perspective on the secular subject of morality. The Club meetings offer children the opportunity to pray with adults, to recite biblical verse, and to declare themselves "saved." The Club argues that these practices are necessary because its viewpoint is that a relationship with God is necessary to make moral values meaningful. Even accepting that this precept is a viewpoint on morality and not a religious principle, it is clear from the conduct of the meetings that the Good News Club goes far beyond merely stating its viewpoint. The Club is focused on teaching children how to cultivate their relationship with God through Jesus Christ. Under even the most restrictive and archaic definitions of religion, such subject matter is quintessentially religious. *See Davis v. Beason,* 133 U.S. 333, 342, 10 S.Ct. 299, 33 L.Ed. 637 (1890) ("The term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will.")

Particularly illuminating in this regard is a comparison to the plaintiffs' activities in *Full Gospel Tabernacle,* 164 F.3d at 829, aff'g 979 F.Supp. 214. Plaintiffs in *Full Gospel Tabernacle* were denied access to a school auditorium in which they wished to conduct "religious worship" services. *See* 979 F.Supp. at 217. The district court described the services in that case as follows:

"We would come in and have what's called a group prayer, congregational prayer. Then we would go into praise and worship, sing different praise and worship songs accompanied by music. From there, [the Reverend] would get up and deliver the message, the service for that evening." Following [the Reverend's] sermon, the Reverends ... engage in an "altar call," where they would "invite someone to receive the Lord as their Savior." The service would then conclude with a closing prayer.

*Id.* (internal citations to record omitted). It is difficult to see how the Club's activities differ materially from the "religious worship" described in *Full Gospel Tabernacle:* each has prayers and devotional songs; each has a central sermon or story with a message; each has a portion in which attendees are called upon to be "saved." Applying a different label to the same activities does not change their nature or import.

In a limited public forum, "constitutional protection is afforded only to expressive activity of a genre similar to those that government has admitted to the limited forum." *Travis v. Owego–Apalachin Sch. Dist.,* 927 F.2d 688, 692 (2d Cir.1991). Stated differently, for those who seek to speak on a topic or in a manner not contemplated by the public entity in opening the limited public forum "there is no fundamental right of freedom of speech." *Bronx Household of Faith,* 127 F.3d at 217. The Club attempts to

---

9. Reverend Fournier also stated in deposition testimony that the values require a relationship with Christ for them to be meaningful to God.

liken its activities to "moral instruction" provided by groups such as the Boy Scouts, the Girl Scouts, and the 4–H Club. Thus, it argues, because the Milford school has permitted these organizations to use its facilities, the school may not exclude the Good News Club. We do not find this argument persuasive. While the Boy Scouts teach reverence and a duty to God generally,[10] this teaching is incidental to the main purpose of the organization, which is personal growth and development of leadership skills. Moreover, there is nothing in the record to indicate that the Boy Scouts require any particular means of demonstrating reverence and duty to God. Similarly, the Girl Scouts vow to "try ... [t]o serve God and [their] country." Even further afield is the attempted comparison to the 4–H Club, which seeks "to enable youth to develop knowledge, skills, abilities, attitudes, and behaviors to be competent, caring adults." Each of these organizations focuses on the development of youth in various ways; however, the record includes nothing to indicate that any of these clubs' activities remotely approach the type of religious instruction and prayer provided by the Club. Accordingly, the Milford school's decision to exclude the Good News Club from its facilities was based on content, not viewpoint. *See, e.g., Rosenberger,* 515 U.S. at 829–30, 115 S.Ct. 2510; *Bronx Household of Faith,* 127 F.3d at 214–15 (distinguishing between permissible content-based distinctions and impermissible viewpoint-based distinctions in a limited public forum).

The Good News Club leans heavily on the Eighth Circuit's holding in *Good News/ Good Sports Club v. School Dist.,* 28 F.3d 1501 (8th Cir.1994). In *Good News/Good Sports,* the Eighth Circuit, over a dissent by Senior Circuit Judge Bright, ruled that the school district's exclusion of a Good News Club/Good Sports Club from its facilities constituted impermissible viewpoint discrimination. *See id.* at 1507. The poli-

cy at issue in *Good News/Good Sports* allowed use of school facilities outside of school hours only for "athletic activities" and Scout group meetings. *See id.* at 1503. The Eighth Circuit found that the policy's inclusion of the Scouts opened the forum to the subject of "moral and character development," the very same purpose for which the Good News/Good Sports Club sought access. *Id.* at 1506. Because it found that the only relevant difference between the Scouts and the Good News/ Good Sports Club was viewpoint, the Eighth Circuit ruled that the Good News/ Good Sports Club could not constitutionally be excluded from school facilities. *See id.* at 1507.

The Eighth Circuit apparently took for granted that the Good News/Good Sports Club's activities amounted only to speaking on moral and character development. The opinion contains only a brief recitation of the types of activities that take place at a club meeting, but no examination of their import. *See id.* at 1502 ("The Club is a community-based, non-affiliated group that seeks to foster the moral development of junior high school students from the perspective of Christian religious values.... Club activities include skits, singing (including Christian songs), role playing, Bible reading, prayer, and speeches by community role models.")

Based on the record before us and this Circuit's precedent, we are constrained to find that the Club's activities fall outside the bounds of pure "moral and character development."

### CONCLUSION

We have examined the Club's other contentions and find them to be without merit. For the foregoing reasons, the judgment of the district court is affirmed.

JACOBS, Circuit Judge, dissenting:

The area of my agreement with the majority is substantial. Thus I agree that the

10. The Scout Law requires that "[a] Scout is reverent toward God. He is faithful in his religious duties. He respects the beliefs of others."

school district has created a limited public forum. *See Cornelius v. NAACP Legal Defense & Educational Fund, Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985). And I recognize that restrictions on speech in a limited public forum withstand First Amendment scrutiny if they are reasonable and viewpoint-neutral. *See Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829–30, 115 S.Ct. 2510, 2517, 132 L.Ed.2d 700 (1995); *Bronx Household of Faith v. Community Sch. Dist. No. 10,* 127 F.3d 207, 211–12 (2d Cir.1997). "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn ... are viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451; *accord Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 392–93, 113 S.Ct. 2141, 2147, 124 L.Ed.2d 352 (1993). In a limited public forum, content discrimination "may be permissible if it preserves the purposes of that limited forum"; but viewpoint discrimination "is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger,* 515 U.S. at 830, 115 S.Ct. at 2517. "The principle ... 'is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Lamb's Chapel,* 508 U.S. at 394, 113 S.Ct. at 2147–48 (quoting *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984)).

It is in the application of this standard to the facts of this case that I respectfully dissent.

\* \* \*

In deciding this case, we are called upon to compare the subject matter of the speech offered by certain groups that are allowed to hold meetings at the Milford Central School with the subject matter of the speech proposed by the Good News Club. The majority posits (and I agree) that some groups allowed at Milford Central School present guidance on a range of common moral subjects, such as honesty and self-control. The majority then rules (and I agree) that the board is obliged to accept "an organization seeking to teach morals from a religious perspective." *See* Majority Opinion at 508, 510–12 [hereinafter "Maj. Op."].

The majority rules against Good News nevertheless on the basis of two complementary distinctions. First, although the school district would be obliged to accept "an organization seeking to teach morals from a religious perspective," the school district is not obliged to accept a "religious youth organization that proposed religious instruction and prayer." *See* Maj. Op. at 508. Second, the majority emphasizes that the Club discusses "religious material through religious instruction and prayer" rather than "secular subjects from a religious viewpoint." *See* Maj. Op. at 510 (citing *Bronx Household of Faith,* 127 F.3d at 215).

On the basis of these two distinctions, the majority concludes that the Club's rejection was based solely upon the subject matter of its meetings and not upon its religious viewpoint. In my view, when the subject matter is morals and character, it is quixotic to attempt a distinction between religious viewpoints and religious subject matters.

Generally, I adhere to the opinion of the Eighth Circuit in *Good News/Good Sports Club v. School Dist.,* 28 F.3d 1501 (8th Cir.1994), which decided the same question in what seems to be a substantially identical context. In the Eighth Circuit case, the Good News/Good Sports Club (for convenience, the "Missouri Club") challenged a policy adopted by a school district in Missouri. The policy allowed various scouting organizations, as well as the school's sports teams, to use junior high school facilities after school, but denied access to other organizations. *See id.* at 1502–03 (providing access for Girl Scouts, Boy Scouts, Cub Scouts, Tiger Cub Scouts, and Brownies). The Missouri Club, along

with its members and their parents, sought injunctive and declaratory relief under 42 U.S.C. § 1983 on the ground that the policy violated their First Amendment right to free speech. *See Good News/Good Sports Club v. School Dist.*, 859 F.Supp. 1239, 1241 (E.D.Mo.1993). The district court entered judgment in favor of the school district, but the Eighth Circuit reversed on the ground that the Missouri Club and the scouting groups both offered messages on the topic of moral development, and that it was impermissible viewpoint discrimination to afford access to the Scouts while denying access to the Missouri Club solely because the latter's approach to moral development was religiously grounded. *See Good News/Good Sports Club*, 28 F.3d at 1505–07.

The Missouri Club and the Club in this case have nearly the same name and are nearly identical in their stated purposes and activities. *Compare Good News/Good Sports Club*, 28 F.3d at 1502 ("The Club is a community-based, non-affiliated group that seeks to foster the moral development of junior high school students from the perspective of Christian religious values.... Club activities include skits, singing (including Christian songs), role playing, Bible reading, prayer, and speeches by community role models. The Club is religious, but non-denominational."), *with Good News Club v. Milford Central Sch.*, 21 F.Supp.2d 147, 149 (N.D.N.Y.1998) ("Although the Club is nondenominational, its stated purpose is to instruct children in family values and morals from a Christian perspective.... [A] typical meeting includes an opening prayer, singing of Christian songs, memorization, recital, and discussion of Biblical verses and scripture, and a closing prayer.").

The majority criticizes the Eighth Circuit opinion on the ground that it "apparently took for granted that the Good News/Good Sports Club's activities amounted only to speaking on moral and character development," and thereby adopted the unexamined assumption that

the discrimination in question was viewpoint-based. Maj. Op. at 511. As I read the Eighth Circuit opinion, however, the court carefully sifted the facts—facts substantially identical to those in the present case—in concluding that the rejection of the Missouri club was based on viewpoint, not content. *See Good News/Good Sports Club*, 28 F.3d at 1505–07 & nn.7–9.

I cannot square the majority's analysis in this case with *Lamb's Chapel v. Center Moriches Union Free School District.* In *Lamb's Chapel*, the Supreme Court held that a school district violated the Free Speech Clause of the First Amendment when it refused to allow its auditorium to be used by a church for the showing of a film series that presented family issues from a Christian perspective. *See Lamb's Chapel*, 508 U.S. at 390–95, 113 S.Ct. at 2146–48. The school district's action denied church members the right to speak from their own perspective (Christian) on a topic (family issues) that would otherwise have been accommodated in the forum. *See id.* at 394, 113 S.Ct. at 2147 ("The film series involved here no doubt dealt with a subject otherwise permissible ... and its exhibition was denied solely because the series dealt with the subject from a religious standpoint.").

The majority asserts that the present case is controlled by our opinion in *Full Gospel Tabernacle v. Community Sch. Dist. 27*, 164 F.3d 829 (2d Cir.1999) ("We affirm for substantially the reasons stated by Judge Haight in the decision below."), *aff'g* 979 F.Supp. 214 (S.D.N.Y.1997), in which case a church sought to use school facilities for its church-wide "worship services." 979 F.Supp. at 216. But this case seems to me to be much closer to *Lamb's Chapel* than to *Full Gospel Tabernacle*. The majority here would distinguish the message of the Club from the message of the church in *Lamb's Chapel*—and from the message of the scout groups in this case—on the ground that the message of the Good News Club has an "additional layer" beyond simply teaching "secular

values such as obedience or resisting jealousy." Maj. Op. at 510. This "additional layer" is the Club's insistence that "these morals or these values are senseless without Christ." *Id.* This distinction lacks traction, because Christ is also the central and animating spirit in the viewpoint expressed in the *Lamb's Chapel* films. Thus in one film, a spokesman on family life warns that the modern family is sliding away from spirituality and toward humanism, and that this slide "can only be counterbalanced by a loving home where Christian values are instilled from an early age." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 959 F.2d 381, 384 (2d Cir.1992). I see no basis for saying that the message of the Good News Club has religious content and that the message of the movie is no more than a religious viewpoint on a secular subject.

The distinction between content discrimination and viewpoint discrimination is elusive and subtle. "Viewpoint discrimination is ... an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829, 115 S.Ct. at 2516. "[D]iscrimination against one set of views or ideas is but a subset or particular instance of the more general phenomenon of content discrimination. And, it must be acknowledged, the distinction is not a precise one." *Id.* at 830–31, 115 S.Ct. at 2517 (internal citation omitted). The distinction is especially slippery where the viewpoint in question is religious, in part because the sectarian religious perspective will tend to look to the deity for answers to moral questions. The idea that moral values take their shape and force from God seems to me to be a viewpoint for the consideration of moral questions. True, religious answers to questions about morals and character tend to be couched in overtly religious terms and to implicate religious devotions, but that is because the sectarian viewpoint is an expression of religious insight, confidence or faith—not because the religious viewpoint is a change of subject:

It is, in a sense, something of an understatement to speak of religious thought and discussion as just a viewpoint, as distinct from a comprehensive body of thought.... Religion may be a vast area of inquiry, *but it also provides ... a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.*

*Id.* at 831, 115 S.Ct. at 2517 (emphasis added).

Although the religious viewpoint thus has the tendency to overwhelm the secularity of a subject matter, this transformative, goal-directed tendency of religious viewpoints does not justify a preference for other viewpoints.

Here, the subject matter is morals and character. The majority focuses on the evident fact that the Club's moral vision entails religious activity, and concludes that this makes the subject matter religious: "Each of these organizations [*i.e.*, those granted access] focuses on the development of youth in various ways; however, the record includes nothing to indicate that any of these clubs' activities remotely approach the type of religious instruction and prayer provided by the Club." Maj. Op. at 511. Perhaps not. But that observation begs the question: Does the "religious instruction and prayer provided by the Club" reflect and express this Club's viewpoint on morals and character? The subject matter (morals and character) is "secular" in the sense that it is often informed by secular perspectives; but the subject matter does not change when it is informed by viewpoints that are sectarian.

The Fourniers argue that presentation of Christian morality entails religious activities such as prayer, that their (religious) viewpoint on the "secular" topic of morality cannot be expressed and promoted without these religious activities, and that forcing them to do so would prevent them from expressing their point of view, in violation of the First Amendment.

As the Eighth Circuit emphasized, the Supreme Court has "refused to cabin religious speech into a separate excludible speech category; rather, the Court [has] adopted a more expansive view, recognizing that a religious perspective can constitute a separate viewpoint on a wide variety of *seemingly* secular subject matter." *Good News/Good Sports Club*, 28 F.3d at 1506–07. This insight has particular force where the "seemingly secular subject matter" is morals and character. No one should be surprised if a religious viewpoint on morality looks very like religion itself.

The school district allows use of its facilities by certain groups that focus on "moral development" of young people. The majority argues that the activities of the Club are "quintessentially religious," while the other groups deal only with the "secular subject of morality." Maj. Op. at 510. The fallacy of this distinction is that it treats morality as a subject that is secular by nature, which of course it may be or not, depending on one's point of view. Discussion of morals and character from purely secular viewpoints of idealism, culture or general uplift will often appear secular, while discussion of the same issues from a religious viewpoint will often appear essentially—quintessentially—religious. "There is no indication when 'singing hymns, reading scripture, and teaching biblical principles' cease to be 'singing, teaching, and reading'—all apparently forms of 'speech,' despite their religious subject matter—and become unprotected 'worship.'" *Widmar v. Vincent*, 454 U.S. 263, 269 n. 6, 102 S.Ct. 269, 274 n. 6, 70 L.Ed.2d 440 (1981) (internal citation omitted). Because the Club's focus appears to be on teaching lessons for the living of a morally fit life, and not on worship, I believe that the Club's message is in fact the "teach[ing of] morals from a religious perspective," Maj. Op. at 508.

Even if one could not say whether the Club's message conveyed religious content or religious viewpoints on otherwise-permissible content, we should err on the side of free speech. The concerns supporting free speech greatly outweigh those supporting regulation of the limited public forum.

\*    \*    \*

Whenever public officials, in executing the school's access policy, evaluate private speech "to discern [its] underlying philosophic assumptions respecting religious theory and belief," the result is "a denial of the right of free speech." *Rosenberger*, 515 U.S. at 845, 115 S.Ct. at 2525. I would reverse the judgment of the District Court.