ORDER ON PETITION FOR PANEL REHEARING
PER CURIAM:
We held that the First Amendment does not force the St. Tammany Parish School Board to permit partisan political activity, for-profit fund-raising, and “religious services” in a limited public forum, reserved for recreational and civic activities. The entire court has refused to reconsider the panel’s opinion. The panel has refused to reconsider for the reasons we will explain.
St. Tammany policy permits “the use of some of the public school buildings as a limited public forum.”[1] The policy permits “civic and recreational meetings and entertainment and other uses pertaining to the welfare of the community.”[2] Basketball games, Scout meetings, and dance or music recitals were the overwhelming uses of the facilities disclosed by the record.[3] While the policy did not attempt to restrict First Amendment activity attendant to such civic or recreational uses,[4] it did exclude partisan political activity, for-profit fund-raising, and “religious services or religious instruction.”[5] Tracking the prohibitions of the rule, plaintiffs requested permission to use St. Tammany’s facilities on a specific occasion “to worship the Lord in prayer and music” and to “pray about” and “engage in religious and Bible instruction with regard to” various issues.[6] The school district denied the request, and the plaintiffs filed suit. The district court granted summary judgment for the plaintiffs, persuaded that the rule was too vague. We reversed.
I
We remain convinced that St. Tammany has not created a public forum. The government, when it chooses to open a forum, necessarily has leeway to establish the terms upon which the forum is opened. Thus, for example, in Lehman v. City of Shaker Heights,[7] a city government had the prerogative to exclude political advertising, even though it generally allowed commercial advertising on city busses.[8] This even though political speech lies at the core of the First Amendment. St. Tammany has done no more than exercise that leeway. It does not censor First Amendment activity attendant to the civic *941 or recreational use of school facilities. It merely forbids three activities, albeit expressive activities: partisan political activity, for-profit fund-raising, and religious services.
Since a middle school is not a traditional public forum,[9] the type of forum created by the St. Tammany policy is a function of the intent of the Board. As the Supreme Court held in Cornelius v. NAACP Legal Defense and Educational Fund,[10]
The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government’s intent.[11]
Here, the intent of St. Tammany is abundantly clear. The policy begins by indicating that it seeks to create “a limited public forum.”[12] That intent, to limit use of the forum, is reinforced by the restrictions imposed in the policy: no partisan political activity, no for-profit fund-raising, and no religious services. These evenhanded exclusions, which the record shows to have been uniformly enforced, also rebut any inference that the purpose statement is somehow pretextual, or made in bad faith. That St. Tammany does not censor speech incident to the civic and recreational uses for which the forum was opened, even specifically including religious viewpoints, “does not imply that the forum thereby becomes a public forum for First Amendment purposes.”[13] It merely implies that St. Tammany assiduously avoided viewpoint discrimination, while still limiting the purposes for which it opened its schools.
St. Tammany has not permitted an indiscriminate range of uses. Express permission, almost always in writing, is required before using any of the school facilities. Many groups use the facilities, but for only a handful of purposes. Although “civic and recreational” uses might have a quite different meaning in San Francisco or Chicago, the local school board, familiar with St. Tammany Parish culture, knew what “civic and recreational” uses meant in St. Tammany. Their expectations regarding the activities they were permitting were not disappointed, and the uses made of school facilities in no way frustrated the board’s explicit purpose of creating a limited public forum. For example, well over half of the uses reported in the record are affirmatively described as sports, dance or music recitals, or Scouting events.[14] The record affirmatively reflects that almost seventy-five percent of all uses were for activities directly related to students, including PTA meetings, standardized tests, and graduations. Although the record shows some that civic groups, such as the Chamber of Com *942 merce or homeowners’ associations, occasionally met in a school cafeteria, the record contains no evidence of the content of the programs, beyond occasional annotations referring to annual teas or banquets. Some plainly were relevant to students; a Lion’s Club, for example, “adopted” a school. In sum, the record shows that St. Tammany schools were overwhelmingly used by groups for activity of interest to students or parents. Such a limited set of uses does not create a public forum, as the Supreme Court held in Perry Education Association v. Perry Local Educators’ Association:
We can only conclude that the schools do allow some outside organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities. This type of selective access does not transform government property into a public forum.... Moreover, even if we assume that by granting access to the Cub Scouts, YMCA’s, and parochial schools, the School District has created a “limited” public forum, the constitutional right of access would in any event extend only to other entities of similar character. While the school mail facilities thus might be a forum generally open for use by the Girl Scouts, the local boys’ club, and other organizations that engage in activities of interest and educational relevance to students, they would not as a con sequence be open to an organization such as PLEA, which is concerned with the terms and conditions of teacher employment.[15]
On the record of this case St. Tammany has not created a public forum. It limited use at all times, and the uses it allowed are overwhelmingly typical interests and activities of students and parents—mostly recreation and sport.
St. Tammany is attempting to open its school facilities. A contrary holding would frustrate that objective and diminish, rather than increase, opportunities for freedom of speech. Under the Supreme Court’s jurisprudence, a government entity such as a school board has the opportunity to open its facilities to activity protected by the First Amendment, without inviting political and religious activities presented in a form that would disserve its efforts to maintain neutrality. We are persuaded that the Constitution does not deprive local school boards of that choice, and courts stand ready to hear complaints of pretext or bad faith. Were we to hold otherwise, a school board would be put to a choice of maintaining a public forum or no forum at all. Just as church services could not be excluded from a public forum, neither could partisan political activities or for-profit fund-raising. There is no “in between” forum in which religious services must be allowed but partisan political activity can be banned. The concept of a limited public forum does not permit such preferences—a preference for religion that itself could be seen as viewpoint based.[16] Nor could St. Tammany allow civic and recreational uses, but categorically bar all attendant First Amendment activity.[17] Thus, if St. Tammany cannot define and limit the forum it creates, it may have no alternative but to close its doors to all after-hours activity.
II
We remain convinced that St. Tammany’s policy is not viewpoint discriminatory. By its plain language, St. Tammany’s policy permits the expression of religious viewpoints. Immediately after *943 the provision challenged here, barring “religious services or religious instruction on school premises,” the policy goes on to state: “However, the use of school facilities by outside organizations or groups outside school hours for the purpose of discussing religious material or material which contains a religious viewpoint or for distributing such material is permissible if it does not interfere with one of the primary uses of such facilities.”[18] The policy’s express tolerance of discussion from a religious viewpoint rebuts any inference of viewpoint discrimination.
St. Tammany’s policy is supported by rational reasons sufficient to rebut any inference that its decision to exclude religious services was viewpoint discriminatory. Especially where, as here, the school district has affirmative evidence that its motive was not viewpoint discrimination,[19] such reasons need only be rational. They need not be compelling. St. Tammany has not singled out religious speech for unfavorable treatment. What St. Tammany has done is to prohibit three forms of potential activities that might erode the neutrality of the schools. St. Tammany bars partisan political activity, lest the schools be drawn into partisan frays or give an appearance of support for Democrats or Republicans. St. Tammany bars religious services, lest the schools appear to prefer Christians or Muslims, and religion over non-religion.[20] It does not matter that the Establishment Clause does not require St. Tammany to exclude religious services. The school board could rationally decide as it did in discharging the duty of evenhanded treatment. Nor does it matter that federal judges would cast a different vote were they members of the school board, or that political winds encourage such views—at least, it should not matter.
This distinction, between prohibiting religious services and prohibiting expression from a religious viewpoint, is no more conceptually difficult than the distinction between prohibiting picketing and prohibiting all picketing except that which bears on a labor dispute.[21] A religious service is an activity, a manner of communicating which carries a very special and distinct meaning in our culture. While a service may express a religious viewpoint, for example, a Catholic mass featuring a prayer for the welfare of the unborn and for the reform of American abortion law, the distinction is between medium and message.[22] Under St. Tammany’s policy, thus, a Catholic group could assemble on school property to “discuss” a Christian anti-abortion viewpoint and “distribute ... material” advocating a Christian anti-abortion viewpoint. They would only run afoul of the *944 policy if they also chose to “conduct religious services.”[23]
“[R]eligious organizations” do not “enjoy rights to communicate ... superi- or to those of other organizations having social, political or ideological messages to proselytize.”[24] In this case, St. Tammany decided that it did not wish to create a public forum. Rather, it preferred a policy of not restricting free expression attending the permitted uses of school facilities, while still avoiding forms of expressive activity that it believed eroded its goal of neutrality. No one in this case contends that St. Tammany is guilty of viewpoint discrimination because it bars partisan political activity. Insisting here that St. Tammany’s ban on religious services is unconstitutional looks less like a reach for equal treatment, and more like a reach for an affirmative preference for religious speakers over political speakers.
Ill
In denying rehearing we note that in the present case, the Plaintiff specifically requested accommodations for a single program of religious worship and instruction. The carefully framed request for use did not propose to lecture or teach religion or religious tenets. The Coalition’s request and the St. Tammany rules are fairly read to speak to worship services. St. Tammany policy follows its prohibition of religious instruction with an explicit statement that “discussing religious material or material which contains a religious viewpoint” is permitted. Read in context, the distinction between religious instruction as part of a religious service and instructing on the matter of religion is clear. St. Tammany’s rules need not be read to prohibit the latter.[25] In any event, that question is not presented in this case.
IV
Plaintiffs draw to our attention the Supreme Court’s decision to grant certiorari in Good News/Good Sports Club v. School Dist. of City of Ladue,[26] This case, however, is materially different. The Milford policy provides that “School premises shall not be used ... for religious purposes.”[27] There is a powerful argument that such a prohibition against the use of facilities for a religious purpose is facially invalid as inevitably presenting viewpoint discrimination. This sharply contrasts with St. Tammany Parish’s prohibition of a religious service. The purpose of the speaker is not the inquiry in St. Tammany Parish. Nor does it present the question of religious instruction. In St. Tammany Parish the request was to “worship the Lord in prayer and music ...,” as we have explained.
The baseline of both the majority and the dissenting opinions in the Second Circuit’s decision in Good News Club was that a worship service could properly be excluded. In the limited forum created by St. Tammany Parish, there is no restriction upon religious activity, including teaching from a religious perspective, attending use of the school facility unless it was partisan political activity, for profit activity, or a religious service. To illustrate our point, as we have read the St. Tammany Parish rule, encouraging children to memorize Bible verses with opening and concluding prayer may be a religious activity, it may have a religious purpose, but it would not be prohibited as *945 a religious service. St. Tammany Parish’s rule against religious service is facially valid, and there is no evidence that its efforts to create a limited public forum or its application of its rules are a pretext for viewpoint-based discrimination. Fairly read in context, the rule draws a clear common sense distinction. That the meaning of a rule prohibiting a religious service can be taxed at its margins is no fatal vice. It is understandable and falls far short of an unlicensed power to censor. The evenhandedness of St. Tammany’s regulations of its school facilities belies any contrary suggestion.
V
Treating the Petition for Rehearing En Banc as a Petition for Panel Rehearing, the Petition for Panel Rehearing is DENIED. The court having been polled at the request of one of the members of the court and a majority of the judges who are in regular active service not having voted in favor (Fed. R.App. P. and 5th Cir. R. 35), the Petition for Rehearing En Banc is DENIED.

. St. Tammany Parish School Board, Use of School Facilities Policy (Nov. 13, 1997).

. Id.

. There is a complete stipulation covering the use of school facilities under the rules at issue here suggesting in part that many groups like to play basketball.

. Compare Bd. of Airport Comm'rs v. Jews for Jesus, 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) (striking down a categorical ban on First Amendment activity in airports).

. St. Tammany Parish School Board, Use of School Facilities Policy (Nov. 13, 1997).

. Campbell v. St. Tammany's Sch. Bd., 206 F.3d 482, 484 (5th Cir.2000).

. 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974).

. 418 U.S. at 300-02, 94 S.Ct. 2714.

. See Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) ("The public schools do not possess all of the attributes ol' streets, parks, and other traditional public forums....”).

. 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

. 473 U.S. at 802, 105 S.Ct. 3439.

. St. Tammany Parish School Board, Use of School Facilities Policy (Nov. 13, 1997).

. 473 U.S. at 805, 105 S.Ct. 3439.

. While groups having a religious character often used the schools, the record reveals that those groups almost always played basketball: "Knights of Columbus: Hoop Shots”; "Starlight Baptist: Basketball Practice.” The Fellowship of Christian Athletes apparently shares this proclivity for basketball. One request for use read: "We need a place to practice [basketball] because Slidell High’s gym is being used for Fellowship of Christian Athletes.” This is in fact the only mention in the record of use by this group, despite Plaintiffs’ efforts to highlight it.

. Perry Educ. Ass’n v. Perry Local Educators' Ass’n, 460 U.S. 37, 47-48, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (emphasis added).

. See Heffron v. Int’l Soc’y for Krishna Consciousness, Inc., 452 U.S. 640, 652-53, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

. See Jews for Jesus, 482 U.S. at 577, 107 S.Ct. 2568.

. St. Tammany Parish School Board, Use of School Facilities Policy (Nov. 13, 1997) (emphasis added).

. The provisions of St. Tammany's policy that expressly permit discussion of religious viewpoints provide affirmative evidence that the policy is not driven by viewpoint discrimination.

. This parallelism raises the question of how far the Plaintiffs would take their reasoning. Would not St. Tammany also be required to allow Democrats and Republicans to hold rallies on school campuses? See Heffron, 452 U.S. at 652-53, 101 S.Ct. 2559.

. See Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95-97, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (noting that the “operative distinction is the message on the picket sign,” and explaining past jurisprudence as “condemning] ... discrimination among different users of the same medium of expression”).

. Widmar v. Vincent, 454 U.S. 263, 269, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), is not to the contrary. As the Supreme Court made clear in Cornelius, the University in Widmar had "evidenced a clear intent to create a public forum.” 473 U.S. at 802, 105 S.Ct. 3439. The error made by the University, which Wid-mar corrected, was the “erroneous conclusion that the Establishment Clause required the exclusion of groups meeting for religious purposes.” 473 U.S. at 803, 105 S.Ct. 3439. Here, by contrast, St. Tammany has evidenced, by its rules and by the manner of enforcement, a clear intent to create only a limited public forum.

. The churches of St. Tammany Parish have little or no interest in using a school facility for such purposes, as a scan of the uses made discloses.

. Heffron, 452 U.S. at 652-53, 101 S.Ct. 2559.

. See Bronx Household of Faith v. Cmty. Sch. Dist. No. 10, 127 F.3d 207, 217 (2d Cir.1997) (Cabranes, J., concurring in part and dissenting in part).

. 202 F.3d 502 (2d Cir.2000), cert. granted -U.S.-, 121 S.Ct. 296, 148 L.Ed.2d 238.

. 202 F.3d at 507.