THE BRONX HOUSEHOLD OF FAITH, Robert Hall and Jack Roberts, Plaintiffs–Appellees,

v.

BOARD OF EDUCATION OF THE CITY OF NEW YORK and COMMUNITY SCHOOL DISTRICT NO. 10, Defendants–Appellants.

Docket No. 02–7781.

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 2002.

Decided June 6, 2003.

Jane L. Gordon, New York, New York (Edward F.X. Hart, Lisa Grumet, Michael A. Cardozo, Corporation Counsel of the

City of New York, New York, of counsel), for Defendants–Appellants.

Jordan W. Lorence, Scottsdale, Arizona (Benjamin W. Bull, Alliance Defense Fund Law Center, Scottsdale, Arizona; Rena Lindevaldsen, Esanu, Katsky, Korins & Siger, LLP, New York, New York; Joseph P. Infranco, Migliore & Infranco, Commack, New York, of counsel), for Plaintiffs–Appellees.

Jay Worona, New York State School Boards Association, Inc., Latham, New York (James R. Sandner, Carol Gerstl, United Federation of Teachers, New York, New York, of counsel), filed a joint amicus curiae brief on behalf of the New York State School Boards Association, Inc. (N.Y.SSBA), and The United Federation of Teachers (UFT).

Jennifer Levin, Washington, D.C. (Ralph F. Boyd, Jr., Assistant Attorney General, David K. Flynn, Eric W. Treene, Civil Rights Division, U.S. Department of Justice, Washington, D.C.; James B. Comey, U.S. Attorney, David J. Kennedy, Neil M. Corwin, Gideon A. Schor, Assistant U.S. Attorneys, Southern District of New York, New York, New York, of counsel), filed a brief for the United States as Amicus Curiae.

Anthony R. Picarello, Jr., Washington, D.C. (Roman P. Storzer, Derek L. Gaubatz, The Becket Fund for Religious Liberty, Washington, D.C., of counsel), filed a brief for The Becket Fund for Religious Liberty as Amicus Curiae.

Before: CARDAMONE, MINER, and KATZMANN, Circuit Judges.

Judge MINER dissents in a separate opinion.

CARDAMONE, Circuit Judge.

This appeal concerns the proposed use of a public school building for Sunday worship services by an evangelical Christian church. Courts often struggle to reconcile the principle of equal access to government buildings with a competing principle of American public life, that is, the separation of church and state. In the case before us, the district court resolved this tension in favor of allowing religious speech on public property. Recent Supreme Court precedent requires that we affirm.

## BACKGROUND

### A. Prior Legal Proceedings

Plaintiff, the Bronx Household of Faith (church), is an evangelical Christian church founded in 1971 and located in the Bronx, New York. Plaintiffs Robert Hall and Jack Roberts are its co-pastors. This litigation represents plaintiffs' second attempt to compel defendants, the Board of Education of the City of New York and Community School District No. 10 (collectively defendants or appellants), to allow plaintiffs to rent space in public school M.S. 206B, Anne Cross Mersereau Middle School (Middle School 206B), for Sunday morning meetings that include, at least in part, activities that may be characterized fairly as religious worship.

Plaintiffs' first application to rent space in Middle School 206B was rejected by defendants in 1994, resulting in litigation between the present plaintiffs and defendants in the Southern District of New York. In that case, the district court granted defendants' motion for summary judgment dismissing plaintiffs' complaint. *Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*, No. 95 Civ. 5501, 1996 WL 700915 (S.D.N.Y. Dec.5, 1996). We affirmed, and the Supreme Court denied certiorari. *Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*, 127 F.3d 207 (2d Cir.1997), *cert. denied*, 523 U.S. 1074, 118

S.Ct. 1517, 140 L.Ed.2d 670 (1998) (*Bronx Household I* ).

In 2001 plaintiffs again applied for use of space in Middle School 206B and, when their application was denied, brought the present action in the United States District Court for the Southern District of New York (Preska, J.). The plaintiffs' central point before the district court was that the Supreme Court's decision in *Good News Club v. Milford Central School*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), effectively overruled our holding in *Bronx Household I.* Plaintiffs contend that, as a result, the Education Board's policy of excluding community groups from renting school premises for purposes of "religious services or religious instruction"—while allowing most other types of community groups to hold meetings—violates their First Amendment right to freedom of speech.

Agreeing that plaintiffs were substantially likely to prevail on the merits of their claim, Judge Preska granted their motion for a preliminary injunction. *Bronx Household of Faith v. Bd. of Educ.*, 226 F.Supp.2d 401 (S.D.N.Y.2002) (*Bronx Household II* ). The preliminary injunction enjoins defendants "from enforcing the New York City Board of Education's Standard Operating Procedure § 5.11 so as to deny plaintiffs' application to rent space in a public school operated by the Board of Education for morning meetings that include religious worship or the application of any similarly-situated individual or entity." From the grant of this preliminary injunction, defendants appeal. The district court and we denied defendants' application for a stay pending appeal.

In reviewing the grant of this preliminary injunction, we revisit a dispute that is no stranger to this Court. Although we have reached the merits in this litigation previously, the issues now raised return to us in a different procedural posture, requiring employment of a different standard of review than that used in *Bronx Household I.* The instant litigation also arises against a backdrop of additional Supreme Court precedent. In *Good News Club*, a recent school and religion case with facts that parallel in many respects those here, the Supreme Court held that "quintessentially religious" activities could be "characterized properly as the teaching of morals and character development from a particular viewpoint." 533 U.S. at 111, 121 S.Ct. 2093. The Supreme Court also reiterated in its *Good News Club* decision that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint. *Id.* at 109–10., 121 S.Ct. 2093 The defendants in this case, like the defendant in *Good News Club*, have opened the relevant limited public forum to the teaching of morals and character development. Accordingly, we affirm and hold that the district court did not abuse its discretion when it granted plaintiffs' motion for a preliminary injunction.

### B. Facts

On July 6, 2001 plaintiffs wrote to the School District renewing their prior request to rent Middle School 206B, citing the Supreme Court's *Good News Club* decision as the basis for the renewed request. Plaintiffs sought to meet at the school from 10:00 a.m. to 2:00 p.m. each Sunday morning, beginning on September 30, 2001, to engage in "singing," "the teaching of adults and children . . . from the viewpoint of the Bible," and "social interaction among the members of [the] church, in order to promote their welfare and the welfare of the community."

Frank Pagliuca, Director of School Facilities and Planning for the School Dis-

trict, responded in writing to the church's request, stating that it appeared to intend to use the school for the same purpose—*i.e.,* "weekly worship service"—that the School District had denied in 1994. Mr. Pagliuca's letter reminded plaintiffs that the District's prior denial "was upheld by the Federal Appeals Court," and advised them that if plaintiffs intended different usage than before, they should submit additional information. Plaintiffs state that on August 16, 2001 their counsel was informed by Deborah King, Esq., an attorney for the Board of Education, that defendants were denying the church's request for rental space "because the meetings would violate the defendants' policy prohibiting religious services or instruction in the school buildings."

Although in this second request to rent space in Middle School 206B, the church did not describe its proposed use as "religious service" or "religious instruction"—likening it instead to other uses permitted under School Board policy—the School Board correctly perceived that plaintiffs were, in substance, renewing their prior request to conduct activities that included a weekly worship service. Plaintiffs have since offered a fuller description of the activities in which they seek to engage:

> The Sunday morning meetings service consists of the singing of Christian hymns and songs, prayer, fellowship with other church members and Biblical preaching and teaching, communion, sharing of testimonies and social fellowship among the church members.
>
> In our church service, we seek to give honor and praise to our Lord and Savior Jesus Christ in everything that we do. To that end we sing songs and hymns of praise to our Lord. We read the Bible and the pastors teach from it because it tells us about God, what He wants us to

do and how we should live our lives. . . . In keeping with ancient tradition, we have a light fellowship meal after the service, which consists basically of coffee, juice and bagels. This gives us opportunity to meet new people, talk to one another, share one another's joys and sorrows so as to be a mutual help and comfort to each other.

> . . .
>
> The Sunday morning meeting is the indispensable integration point for our church. It provides the theological framework to engage in activities that benefit the welfare of the community. Those who attend the Sunday morning meetings are taught to love their neighbors as themselves, to defend the weak and disenfranchised, and to help the poor regardless of their particular beliefs. It is a venue where people can come to talk about their particular problems and needs. Over the years we have helped people with basic needs such as food, clothing, and rent. We have also provided, by means of counseling, friendship and encouragement, help for people to get out of the multi-generational welfare cycle, to lead productive lives, to leave a life of crime and/or drugs to become responsible citizens, and to counsel people whose personal finances are out of control.
>
> In one recent case we helped an individual who was about to get evicted. . . . It is through the Sunday meeting where we directly or indirectly learn of these situations and where we can converse with the individuals involved in order to monitor the progress of the issue to be resolved.
>
> In years past, the church meeting was a very important place for Cambodian Refugees to come in order for us to get to know them so that we could help them with food, clothing and to help

them get acclimated to American society. Most of them were Buddhists.

The Sunday morning meetings of the church are open to all members of the public. The church currently conducts its Sunday meetings in a large house or outdoors under a tent or canopy. The church also owns a vacant lot and asserts that it eventually intends to construct its own building.

The School District's denial of the church's request to rent school space—in 1994 and again in 2001—was based on the Education Board's Standard Operating Procedures (SOP) Manual that sets forth a hierarchy of permitted uses of school facilities. According to the SOP Manual, the primary use of school premises must be for programs and activities of the Board of Education. After the Board's programs and activities, school premises may be used for a variety of community activities, including "social, civic and recreational meetings and entertainment, and other uses pertaining to the welfare of the community," as long as these uses are "non-exclusive and open to the general public."

Section 5.11 of the SOP Manual—enumerated as section 5.9 at the time of *Bronx Household I*—prohibits any "outside organization or group" from conducting "religious services or religious instruction on school premises after school." The same section permits the use of school premises "for the purpose of discussing religious material or material which contains a religious viewpoint or for distributing such material."

The School District has over the years permitted a variety of organizations to use school premises for meetings and activities after school hours and on weekends. Examples of organizations that received such permission during the 2000–2001 school year include Girl Scouts; the Mosholu Community Center, which organizes sports and other recreational activities; University Heights, which sponsored sports events, holiday shows and activities relating to Black History Month; and Lehman College, which held classes in teaching English as a second language. At the same time, the School District has never granted an application seeking to use school facilities for religious services.

We pass now to a discussion of the rules governing the issuance of a preliminary injunction in general, and then apply those rules to this case.

## DISCUSSION

### I Standard of Review

■ A district court's grant of a preliminary injunction is reviewed for an abuse of discretion. Such an abuse occurs when the district court bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts. *See Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). In cases raising First Amendment issues, "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 284–286, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

■ To obtain a preliminary injunction a party must demonstrate: (1) that it

will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor. *See Forest City Daly Hous., Inc. v. Town of North Hempstead,* 175 F.3d 144, 149 (2d Cir. 1999). Where the requested preliminary injunction would stay government action taken in the public interest pursuant to a statutory or regulatory scheme—as it does here—the less rigorous burden of proof standard envisioned by the phrase "fair ground for litigation" does not apply, and instead the party seeking injunctive relief must satisfy the more rigorous prong of "likelihood of success." This higher standard of proof requires judicial deference to those regulations developed through reasoned democratic processes. *See id.*

■ Moreover, an even higher standard of proof comes into play when the injunction sought will alter rather than maintain the status quo. In such case, the movant must show a "clear" or "substantial" likelihood of success. *See Rodriguez ex rel. Rodriguez v. DeBuono,* 175 F.3d 227, 233 (2d Cir.1999) (per curiam). Because the plaintiffs here sought an injunction that commands a positive act that alters the status quo, the district court correctly required that plaintiffs demonstrate a "clear" or "substantial" likelihood of success on the merits.

## II Irreparable Harm

■ In determining whether there was an abuse of discretion in the grant of injunctive relief, we first address the issue of irreparable harm. In finding irreparable harm, the district court observed that the plaintiffs' claims implicate First Amendment speech rights that are the bedrock of our liberties, and concluded that the church will suffer serious damage were an injunction not to issue. Although "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), we have not consistently presumed irreparable harm in cases involving allegations of the abridgement of First Amendment rights, *see Amandola v. Town of Babylon,* 251 F.3d 339, 343 (2d Cir.2001) (per curiam).

On the one hand, we have said that since violations of First Amendment rights are presumed to be irreparable, the allegation of a First Amendment violation satisfies the irreparable injury requirement. *Tunick v. Safir,* 209 F.3d 67, 70 (2d Cir.2000). On the other hand, we have suggested that, even when a complaint alleges First Amendment injuries, irreparable harm must still be shown—rather than simply presumed—by establishing an actual chilling effect. *See Latino Officers Ass'n v. Safir,* 170 F.3d 167, 171 (2d Cir.1999).

Whatever tension may be said to exist in our case law regarding whether irreparable harm may be presumed with respect to complaints alleging First Amendment violations, we think is more apparent than real. Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed. For example, in *Tunick* an artist was denied a city permit to conduct a photographic shoot of nude models on a residential street. 209 F.3d at 69. In *Bery v. City of New York,* 97 F.3d 689 (2d Cir.1996), groups of visual artists opposed enforcement of a city regulation prohibiting them from exhibiting or selling their work in public places without a general vendor's license; under the regulation, only a limited number of the licenses could be in effect at any time. *Id.* at 691–92. In

both cases the challenged government action directly limited speech and irreparable harm was presumed. *See Tunick,* 209 F.3d at 70; *Bery,* 97 F.3d at 693–94.

▮ In contrast, in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights. The Supreme Court instructs us on this issue in *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), that to establish a cognizable claim founded on the chilling of First Amendment rights, a party must articulate a "specific present objective harm or a threat of specific future harm." *Id.* at 14.

Thus, in *Latino Officers Ass'n,* plaintiffs challenged a police department's requirements that all officers notify the department of their intention to speak before a governmental agency or a private organization about department policy, and that they provide an after-the-fact summary of their comments. 170 F.3d at 169, 171. We found the theoretical possibility of a chilling effect on officers' speech too conjectural and insufficient to establish irreparable harm. *Id.* at 171. In *Charette v. Town of Oyster Bay,* 159 F.3d 749 (2d Cir.1998), we ruled the record insufficient to decide a topless bar operator's motion to enjoin enforcement of a zoning regulation that resulted in the bar's closing. The record contained no evidence indicating how soon after the issuance of the injunction, if at all, the bar could be reopened. *Id.* at 750–51, 756–57; *see also Am. Postal Workers Union, AFL–CIO v. U.S. Postal Serv.,* 766 F.2d 715, 722 (2d Cir.1985) (reversing a preliminary injunction enjoining employee's discharge pending arbitration because discharge did not chill First Amendment rights of members of union sufficiently to cause irreparable harm).

Here, the alleged deprivation of plaintiffs' First Amendment rights results directly from a policy of the defendant Board of Education that prohibits "religious services or religious instruction" in school facilities. Since it is this policy that led to a denial of the church's request to rent space in Middle School 206B and directly limits plaintiffs' speech, irreparable harm may be presumed. Because the plaintiffs' allegations entitle them to a presumption of irreparable harm, the district court's finding that the plaintiffs have fulfilled this requirement for the issuance of a preliminary injunction cannot be said to be an abuse of discretion.

### III Likelihood of Success on the Merits

Given that plaintiffs have demonstrated irreparable harm, we now reach the more difficult issue of whether the district court properly found that plaintiffs had shown a likelihood of success on the merits. As noted earlier, because they seek an injunction that alters rather than preserves the status quo plaintiffs must satisfy a more rigorous standard of proof and demonstrate a clear or substantial likelihood of such success. *Rodriguez,* 175 F.3d at 233.

In determining whether defendants' denial of the plaintiffs' application to rent the school violates plaintiffs' First Amendment rights, we tread familiar ground. Faced with the same parties and identical facts, we reached the merits of this issue in *Bronx Household I,* upholding the district court's summary judgment ruling in favor of the defendants Board of Education and School District. Plaintiffs now insist that the Supreme Court's decision in *Good News Club,* in effect, overruled our holding in *Bronx Household I.* Judge Preska was persuaded to this view and hence ruled plaintiffs had demonstrated a substantial

likelihood of success on the merits of the litigation. In order to ascertain whether this holding was an abuse of discretion, we examine our earlier decision in *Bronx Household I* and the Supreme Court's opinion in *Good News Club*.

## A. *Bronx Household I*

■ In *Bronx Household I*, we observed that the right to exercise free speech on government property depends on the kind of forum where the speech occurs, noting that the Supreme Court has identified three kinds: the traditional public forum, the designated public forum or "limited public forum," and the nonpublic forum. 127 F.3d at 211 (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). Although the church argued that Middle School 206B is an open public forum where the exercise of First Amendment rights cannot be excluded absent a compelling state interest, *see* 127 F.3d at 212, we were not persuaded that the school was "a place that has been devoted to general, unrestricted public assembly by long tradition or by policy or practice," *id.* at 213. Instead, we reasoned that the Board of Education, by restricting access to certain speakers and subjects, had created a limited public forum. *Id.* Within such a limited forum, the government may restrict access based on speaker identity and subject matter, but only if "the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* at 211–12 (quoting *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439).

Having decided that the school was a limited public forum, we next addressed the question of whether the Education Board's rule prohibiting religious services and instruction is reasonable and viewpoint neutral. We held it reasonable for state legislators and school authorities to avoid identifying a public school with a particular church, when considering the effect of such identification on the minds of school children. *Id.* at 214. We also deemed the regulation viewpoint neutral, since it "specifically permits any and all speech from a religious viewpoint." *Id.* We recognized that religious worship services were barred, but believed a permissible distinction could be drawn between religious worship and other forms of speech from a religious viewpoint. *Id.* at 215. For those reasons and because Middle School 206B was a limited public forum, we affirmed the summary judgment ruling in favor of the defendants.

## B. *Good News Club*

Subsequent to our decision in *Bronx Household I*, the Supreme Court decided *Good News Club v. Milford Central School.* At issue in *Good News Club* was defendant Milford Central School's community use policy that prohibited the use of school premises "by any individual or organization for religious purposes." 533 U.S. at 103, 121 S.Ct. 2093. Because of this policy the school refused to allow plaintiff Good News Club, a private Christian organization for children between the ages of six and 12, to use school premises for activities that included praying, singing, reading, and learning the Bible. The school denied plaintiff's request to use its facilities because it thought "the kinds of activities proposed to be engaged in by the Good News Club were not a discussion of secular subjects such as child rearing, development of character and development of morals from a religious perspective, but were in fact the equivalent of religious instruction itself." *Id.* at 103–04, 121 S.Ct. 2093.

The Good News Club sued challenging the school's policy on First Amendment

grounds. The district court granted the school's motion for summary judgment and we affirmed, reasoning that the exclusion of the Club's "quintessentially religious" activities was constitutional content discrimination, not unconstitutional viewpoint discrimination. *Good News Club v. Milford Cent. Sch.*, 202 F.3d 502, 510–11 (2d Cir.2000). The Supreme Court granted certiorari to resolve the conflict among the circuits "on the question whether speech can be excluded from a limited public forum on the basis of the religious nature of the speech." *Good News Club*, 533 U.S. at 105, 121 S.Ct. 2093. In the context of stating its intention to resolve that conflict, the Court mentioned our opinion in *Bronx Household I* and noted that it was on the same side of the split as *Campbell v. St. Tammany's School Board*, 206 F.3d 482 (5th Cir.2000), a decision relying in part on our opinion in *Bronx Household I*, and one which the Supreme Court subsequently vacated and remanded in light of *Good News Club, see Campbell v. St. Tammany's Sch. Bd.*, 533 U.S. 913, 121 S.Ct. 2518, 150 L.Ed.2d 691 (2001). *See Good News Club*, 533 U.S. at 105–06, 121 S.Ct. 2093.

In reversing the judgment of this Court, a divided Supreme Court found that by excluding the meetings of the Good News Club while allowing other types of instruction on moral and ethical issues the school maintained an exclusionary policy that "constitutes viewpoint discrimination." *Id.* at 107, 121 S.Ct. 2093. The majority characterized the Club's proposed activities as teaching morals and character from a religious perspective. It did not think something that is " 'quintessentially religious' or 'decidedly religious in nature' cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint." *Id.* at 111, 121 S.Ct. 2093. Because the school allowed teachings about morals and character from a variety of other, secular perspectives, the

Court continued, the school could not legally exclude the Club's meetings solely because of the religious viewpoint it advocated. *Id.* at 111–12, 121 S.Ct. 2093. The Court concluded by stating, "What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons." *Id.* at 111, 121 S.Ct. 2093.

Significantly, the majority found no meaningful distinction between the case before it and *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). *Good News Club*, 533 U.S. at 111–12, 121 S.Ct. 2093. In *Lamb's Chapel*, the Supreme Court held that a school could not prohibit an outside group's demonstration of a film about family values simply because the film addressed the issue from a religious perspective, where the school admittedly would have allowed demonstration of a film addressing family values from a secular perspective. 508 U.S. at 393–94, 113 S.Ct. 2141. The *Good News Club* majority reasoned that the Club— like the *Lamb's Chapel* plaintiffs—was seeking "to address a subject otherwise permitted [in the school], the teaching of morals and character, from a religious standpoint." The fact that the Good News Club proposed to conduct the teaching through "storytelling and prayer" rather than through film, as in *Lamb's Chapel*, was an "inconsequential" distinction. 533 U.S. at 109–12, 121 S.Ct. 2093.

The dissenting members of the Supreme Court—Justices Stevens, Souter, and Ginsburg—perceived the speech at issue in *Good News Club* to be sufficiently different from that in *Lamb's Chapel* to require the opposite result. Justice Stevens drew a distinction between three types of speech

for religious purposes: (1) "religious speech that is simply speech about a particular topic from a religious point of view," such as the film at issue in *Lamb's Chapel,* (2) "religious speech that amounts to worship, or its equivalent," and (3) an "intermediate category that is aimed principally at proselytizing or inculcating belief in a particular religious faith." The Good News Club's meetings, in his estimation, fell into the third or proselytizing category. 533 U.S. at 130, 133, 121 S.Ct. 2093 (Stevens, J., dissenting).

Justice Souter was of the opinion that "Good News intends to use the public school premises not for the mere discussion of a subject from a particular, Christian point of view, but for an evangelical service of worship calling children to commit themselves in an act of Christian conversion." *Id.* at 138, 121 S.Ct. 2093 (Souter, J., dissenting). He emphasized that the Club's intended activities included elements of worship that made the case as different from *Lamb's Chapel* "as night from day." *Id.* at 137, 121 S.Ct. 2093. Justice Souter further observed that the Club's meetings opened and closed with prayer, and that at the heart of each meeting was "the challenge," when the already "saved" children were invited to ask God for strength; and "the invitation," when the teacher would "invite" the "unsaved" children to "receive" Jesus as their "Savior from sin." *Id.* at 137–38, 121 S.Ct. 2093. This dissenting justice criticized the majority's characterization of the Club's activities as "teaching of morals and character, from a religious standpoint" as ignoring reality. *Id.* at 138–39, 121 S.Ct. 2093.

The Supreme Court majority was not persuaded by the distinction drawn by the dissenters between speech from a religious perspective on the one hand and worship or proselytizing on the other. It did agree with Justice Souter's description of the Club's activities, which we just related, but concluded that those activities "do not constitute mere religious worship, divorced from any teaching of moral values." 533 U.S. at 112 n. 4, 121 S.Ct. 2093. The majority saw "no reason to treat the Club's use of religion as something other than a viewpoint merely because of any evangelical message it conveys." Notwithstanding Justice Souter's forcefully expressed challenge, it explicitly rejected his characterization of the Club's activities as an "evangelical service of worship," saying that "[r]egardless of the label Justice Souter wishes to use, what matters is the substance of the Club's activities, which we conclude are materially indistinguishable from the activities in *Lamb's Chapel* and *Rosenberger[ v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 832, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (holding that a university's refusal to pay a third-party contractor for the printing costs of a student publication, based on the publication's religious editorials, was viewpoint discrimination) ]." *Id.*

## IV Resolution of Instant Appeal

### A. Free Speech

 Having laid out for purposes of comparison our holding in *Bronx Household I* and the Supreme Court's *Good News Club* opinion, we turn to an analysis of *Bronx Household II,* the appeal presently before us. We start with the holding of the trial court. In granting plaintiffs' motion for a preliminary injunction it relied on the Supreme Court's holding in *Good News Club,* believing that the activities proposed by the plaintiff church are similar to those in *Good News Club.* The trial court also thought that, after *Good News Club,* religious worship could not be treated as an inherently distinct type of activity, and was instead comparable to other activities involving ritual and cere-

mony, such as Boy and Girl Scout meetings. Additionally, it viewed the distinction between worship and other types of religious speech as one that cannot meaningfully be drawn by the courts.

Based upon our reading of the Supreme Court's decision in *Good News Club,* we do not think the district court abused its discretion in determining that the plaintiffs were substantially likely to establish that defendants violated their First Amendment free speech rights. Central to our conclusion is a candid acknowledgment of the factual parallels between the activities described in *Good News Club* and the activities at issue in the present litigation.

Although the majority in *Good News Club* characterized the Club's activity as "the teaching of morals and character development from a particular viewpoint," 533 U.S. at 111, 121 S.Ct. 2093, this characterization cannot be divorced from Justice Souter's detailed description of the Club's activities that the majority adopted as accurate. *Id.* at 112 n. 4, 121 S.Ct. 2093. In Justice Souter's view, the Club's meetings did not consist solely of teaching, but also included elements consistent with "an evangelical service of worship." *Id.* at 138, 121 S.Ct. 2093 (Souter, J., dissenting). The majority did not say that the meetings were somehow distinct from worship services, but simply observed that they were not "mere religious worship, divorced from any teaching of moral values." *Id.* at 112 n. 4, 121 S.Ct. 2093.

We find no principled basis upon which to distinguish the activities set out by the Supreme Court in *Good News Club* from the activities that the Bronx Household of Faith has proposed for its Sunday meetings at Middle School 206B. Like the Good News Club meetings, the Sunday morning meetings of the church combine preaching and teaching with such "quintessentially religious" elements as prayer, the singing

of Christian songs, and communion. The church's Sunday morning meetings also encompass secular elements, for instance, a fellowship meal during which church members may talk about their problems and needs. On these facts, it cannot be said that the meetings of the Bronx Household of Faith constitute only religious worship, separate and apart from any teaching of moral values. 533 U.S. at 112 n. 4, 121 S.Ct. 2093.

Because the Board of Education has authorized other groups, like scout groups, to undertake the teaching of morals and character development on school premises, there is a substantial likelihood that plaintiffs would be able to demonstrate that the Board cannot exclude, under Supreme Court precedent, the church from school premises on the ground that the church approaches the same subject from a religious viewpoint. Additionally, the defendants' school building use policy permits social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community, so long as these uses are non-exclusive and open to the public. Therefore, there is a substantial likelihood that plaintiffs would be able to demonstrate that the defendants cannot bar the church's proposed activities without engaging in unconstitutional viewpoint discrimination.

We hold the district court did not commit an error of law or fact and therefore did not abuse its discretion by determining that plaintiffs were substantially likely to establish that defendants violated their First Amendment free speech rights. Our ruling is confined to the district court's finding that the activities plaintiffs have proposed for their Sunday meetings are not simply religious worship, divorced from any teaching of moral values or other activities permitted in the forum.

We decline to review the trial court's further determinations that, after *Good News Club*, religious worship cannot be treated as an inherently distinct type of activity, and that the distinction between worship and other types of religious speech cannot meaningfully be drawn by the courts. We recognize that these conclusions are in obvious tension with our previous holding that a permissible distinction may be drawn between religious worship and other forms of speech from a religious viewpoint, *Bronx Household I*, 127 F.3d at 215, a proposition that was seriously undermined but not explicitly rejected in *Good News Club*. It is unnecessary for us to reach these issues in order to affirm the trial court's grant of a preliminary injunction in this case.

We pause, however, to note some unresolved issues that arise from the recent Supreme Court precedent that, as an appellate court, we are bound to follow. Would we be able to identify a form of religious worship that is divorced from the teaching of moral values? Should we continue to evaluate activities that include religious worship on a case-by-case basis, or should worship no longer be treated as a distinct category of speech? How does the distinction drawn in our earlier precedent between worship and other forms of speech from a religious viewpoint relate to the dichotomy suggested in *Good News Club* between "mere" worship on the one hand and worship that is not divorced from the teaching of moral values on the other?

Further, how would the state, without imposing its own views on religion, define which values are morally acceptable and which are not? And, if such a choice is impossible to make, would the state be required to permit the use of public school property by religious sects that preach ideas commonly viewed as hateful? When several religious groups seek to use the same property at the same time, would not the state have to choose between them? What criteria would govern that choice? In all of this process, is there not a danger of excessive entanglement by the state in religion?

How the Supreme Court answers these difficult questions will no doubt have profound implications for relations between church and state. The American experiment has flourished largely free of the religious strife that has stricken other societies because church and state have respected each other's autonomy. Religion and government thrive because each, conscious of the corrosive perils of intrusive entanglements, exercises restraint in making claims on the other. The beneficiaries are a diverse populace that enjoys religious liberty in a nation that honors the sanctity of that freedom.

### B. Establishment Clause

██ We must resolve one final issue, that is, whether it is substantially likely that defendants will not succeed in demonstrating that their denial of plaintiffs' application is necessary to avoid a violation of the Establishment Clause.

The First Amendment to the United States Constitution, applicable to the states under the Fourteenth Amendment, prohibits the enactment of any "law respecting an establishment of religion." U.S. Const. amend I. Defendants maintain that, even if their actions infringe on plaintiffs' First Amendment rights, the infringement is justified because it is necessary to avoid an appearance of state endorsement of religion and excessive entanglement between state and religion, in violation of the Establishment Clause.

In *Good News Club*, the majority acknowledged that a state's interest in avoiding an Establishment Clause violation "may be characterized as compelling, and

therefore may justify content-based discrimination." 533 U.S. at 112, 121 S.Ct. 2093. The Court then noted that, although its precedent did not yet establish whether that interest may also justify viewpoint-based discrimination, it did not need to resolve the issue because the school did not have a valid Establishment Clause interest. *Id.* at 113, 121 S.Ct. 2093. In so ruling, the Supreme Court emphasized that the Good News Club's meetings were held after school hours, were not sponsored by the school, and were open to all students who obtained parental consent. It also noted that the school had made its forum equally available to other organizations. *Id.*

In addition, the Supreme Court rejected the argument that the young age of the children attending the elementary school impermissibly increased the danger of misperception of endorsement, stating that the Court had "never extended [its] Establishment Clause jurisprudence to foreclose private religious conduct during nonschool hours merely because it takes place on school premises where elementary school children may be present." *Id.* at 115, 121 S.Ct. 2093. The Court emphasized that "even if [it] were to inquire into the minds of schoolchildren in [that] case, [it could not] say the danger that children would misperceive the endorsement of religion [was] any greater than the danger that they would perceive a hostility toward the religious viewpoint if the Club were excluded from the public forum." *Id.* at 118, 121 S.Ct. 2093.

Relying on the Supreme Court's *Good News Club* rationale, the district court here concluded that there was a substantial likelihood that the church would be able to demonstrate that the School Board does not have a valid Establishment Clause interest because the proposed meetings: (1) occur on Sunday mornings, during nonschool hours; (2) are not endorsed by the School District; (3) are not attended by any school employee; (4) are open to all members of the public; (5) and there is no evidence that any school children would be on the school premises on Sunday mornings or would attend the meetings. To this list the district court might have added that the church apparently intended to pay rent for the use of the space. The district court believed that by allowing the meetings defendants were more likely to demonstrate neutrality toward religion, and would therefore probably not violate the Establishment Clause.

In light of the Supreme Court's refusal to find a valid Establishment Clause interest in *Good News Club,* and the strong factual similarities between this case and *Good News Club,* the district court's ruling is adequately supported at this stage of the litigation. The dissent's conclusion to the contrary, in our estimation, misapplies the necessarily deferential standard of review. We hasten to add, however, that this issue is factual and its resolution in favor of plaintiffs now does not foreclose the possibility that defendants may, with further development of the record, ultimately prevail on it.[1]

### C. *Res Judicata* and Collateral Estoppel

As an endnote in our analysis, we hold the district court did not abuse its discretion in concluding that plaintiffs' claims were not barred by the principles of *res judicata* and collateral estoppel. Although defendants contend that plaintiffs' claims are barred by these doctrines they concede

---

**1.** For this very reason, the opening sentence of the dissent severely mischaracterizes the impact of our holding.

that a change in a controlling legal principle precludes their application. The defendants' argument that no such change has occurred is answered by our discussion.

## CONCLUSION

In sum, in the district court's grant of plaintiffs' motion for a preliminary injunction we find no errors of law or clearly erroneous findings of fact that could be said to constitute an abuse of discretion. The trial court properly found that the plaintiffs' claims are entitled to a presumption of irreparable harm and that, in light of the Supreme Court's opinion in *Good News Club,* plaintiffs are substantially likely to prevail on the merits.

The grant of a preliminary injunction is accordingly affirmed.

MINER, Circuit Judge, dissenting.

Today, the Majority permits a public school building in the Bronx to be designated "Middle School 206B and The Bronx Household of Faith." For more than sixty years, the sovereign State of New York has not included religious worship services in the list of uses permitted in public school buildings. The Board of Education of the City of New York and Community School District No. 10 (collectively, the "School Board") have specifically excluded such usage. More than five years ago, in a case brought by the same parties as those before us today concerning the use of the same public school facilities, a panel of this court unanimously held that this long-standing legislative policy did not violate the Free Speech Clause of the First Amendment. Review of our decision was sought in the Supreme Court, and that request for review was denied. In concluding that Plaintiffs have a clear or substantial likelihood of succeeding on the merits of their First Amendment claim,

the Majority thwarts the will of the people of the State and City of New York to regulate a sphere of public life that has been traditionally left to state and local democratically elected bodies, as well as casts aside a binding precedent of this court. The sole justification offered by the Majority for these actions is that facts from the rather undeveloped record in the case before us parallel those in a Supreme Court decision involving religious instruction. Because I believe that, on the record before us, such a parallel does not exist, I respectfully dissent.

### I.

### A.

Section 414, subdivision 1 of the Education Law of the State of New York, duly adopted by the New York Legislature and approved by the Governor, provides, in relevant part, that "[s]choolhouses and the grounds connected therewith and all property belonging to the district shall be in the custody and under the control and supervision of the Trustees or board of education of the district." N.Y. Educ. Law § 414(1) (McKinney 2002). The statute confers upon boards of education the authority to promulgate reasonable regulations for the use of the schoolhouses within their school districts, subject to review on appeal to the Commissioner of Education. *Id.* Subject to the regulations adopted, a board of education may,

> permit the use of the schoolhouse and rooms therein, and the grounds and other property of the district, when not in use for school purposes or when the school is in use for school purposes if in the opinion of the trustees or board of education use will not be disruptive of normal school operations, for any of the following purposes:

(a) For the purpose of instruction in any branch of education, learning or the arts.

(b) For public library purposes, subject to the provisions of this chapter, or as stations of public libraries.

(c) For holding social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community; but such meetings, entertainment and uses shall be non-exclusive and shall be open to the general public.

(d) For meetings, entertainments and occasions where admission fees are charged, when the proceeds thereof are to be expended for an educational or charitable purpose; but such use shall not be permitted if such meetings, entertainments and occasions are under the exclusive control, and the said proceeds are to be applied for the benefit of a society, association or organization of a religious sect or denomination, or of a fraternal, secret or exclusive society or organization other than organizations of veterans of the military, naval and marine service of the United States and organizations of volunteer firefighters or volunteer ambulance workers.

(e) For polling places for holding primaries and elections and for the registration of voters and for holding political meetings. But no meetings sponsored by political organizations shall be permitted unless authorized by a vote of a district meeting, held as provided by law, or, in cities by the board of education thereof. Except in cities, it shall be the duty of the trustees or board of education to call a special meeting for such purpose upon the petition of at least ten per centum of the qualified electors of the district. Authority so granted shall continue until revoked in like manner and by the same body as granted.

(f) For civic forums and community centers. Upon the petition of at least twenty-five citizens residing within the district or city, the trustees or board of education in each school district or city shall organize and conduct community centers for civic purposes, and civic forums in the several school districts and cities, to promote and advance principles of Americanism among the residents of the state. The trustees or board of education in each school district or city, when organizing such community centers or civic forums, shall provide funds for the maintenance and support of such community centers and civic forums, and shall prescribe regulations for their conduct and supervision, provided that nothing herein contained shall prohibit the trustees of such school district or the board of education to prescribe and adopt rules and regulations to make such community centers or civic forums self-supporting as far as practicable. Such community centers and civic forums shall be at all times under the control of the trustees or board of education in each school district or city, and shall be non-exclusive and open to the general public.

(g) For classes of instruction for mentally retarded minors operated by a private organization approved by the commissioner of education.

(h) For recreation, physical training and athletics, including competitive athletic contests of children attending a private, nonprofit school.

(i) To provide child care services during non-school hours, or to provide child care services during school hours for the children of pupils attending the schools of the district and, if there

is additional space available, for children of employees of the district, and, if there is further additional space available, the Cobleskill–Richmondville school district shall provide child care services for children ages three and four who need child care assistance due to lack of sufficient child care spaces. Such determination shall be made by each district's board of education, provided that the cost of such care shall not be a school district charge but shall be paid by the person responsible for the support of such child; the local social services district as authorized by law; or by any other public or private voluntary source or any combination thereof.

(j) For graduation exercises held by non-for-profit elementary and secondary schools, provided that no religious service is performed.

*Id.*

As is apparent from the foregoing, there is no provision in New York law for the use of public schoolhouses for purposes of religious worship. (Nor is there provision for partisan political meetings and various other purposes.) Moreover, it is of note that, where admission fees are charged for uses that are ordinarily permitted, such as entertainments, meetings and similar occasions, such uses are barred where the "proceeds are to be applied for the benefit of a society, association or organization of a religious sect or denomination." *Id.* § 414(1)(d). It is the clear policy of the State of New York to bar religious activities from the public schools to the greatest extent possible. In furtherance of the New York policy, and in accordance with the authority conferred to promulgate regulations that "conform to the purposes and intent" of the statute relating to the uses of schoolhouses and grounds, the Board of Education of the City of New York has adopted the following regulation:

> No outside organization or group may be allowed to conduct religious services or religious instruction on school premises after school. However, the use of school premises by outside organizations or groups after school for the purposes of discussing religious material or material which contains a religious viewpoint or for distributing such material is permissible.

New York City Board of Education, Standard Operating Procedures § 5.11 (formerly § 5.9).

The "religious viewpoint" language in the second sentence of § 5.11 is an exception obviously derived from Supreme Court precedent. This precedent was summed up in the most recent Supreme Court pronouncement on the use of school property for religious speech:

> [W]e reaffirm our holding in *Lamb's Chapel [v. Center Moriches Union Free School District*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993),] and *Rosenberger [v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995),] that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint. Thus, we conclude that [the school district's] exclusion of the [Good News] Club[, an evangelical Christian organization for children ages six to twelve] from use of [a public school] pursuant to its community use policy, constitutes impermissible viewpoint discrimination.

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001).

### B.

The linchpin of the Majority's conclusion that the policies described above violate the Free Speech Clause is its conclusion that "[o]n these facts, it cannot be said that the meetings of the Bronx Household of Faith constitute only religious worship, separate and apart from any teaching of moral values." The facts relied on by the Majority are taken from a self-serving letter written by Bronx Household of Faith co-Pastors Robert Hall and Jack Roberts requesting the use of Middle School ("M.S.") 206B and a self-serving affidavit submitted by Pastor Hall after his deposition was taken in this case. Both documents—probably written with the assistance of counsel[1]—tellingly decline to mention the church's intent to use M.S. 206B for worship services and instead attempt to persuade the reader that the church's proposed use of the public school involves instruction from a "religious viewpoint." While the Majority sees through this ruse by correctly observing that "plaintiffs were, in substance, renewing their prior request to conduct activities that included a weekly worship service," the Majority declines to focus on the undisputed facts elicited during Pastor Hall's deposition that put to rest any doubts about whether the church's proposed meetings are anything but religious worship services.

According to Pastor Hall, the reason why the Bronx Household of Faith requested to use M.S. 206B on Sundays between the hours of 10 a.m. and 2 p.m. was that this was the regular weekly time when it held its religious worship services. These services are held on Sundays because that day is "the Christian day of worship." The purpose of these meetings is to "engage in singing of Christian songs and psalms, to pray, to do Bible preaching and to do fellowship with other church members." The service is led by one of four men, two of whom are pastors, but the "preaching is done primarily" by the two pastors.

The service, which is preceded by an hour of Sunday school, begins at approximately 11 a.m. and lasts for about two hours. The meeting usually "opens with a prayer," which is typically followed by "a reading from a psalm," the singing of psalms, and a prayer from the congregation. Sometimes, personal testimonials are then made by members of the congregation about how the church helped them with a personal problem. Personal testimonials are followed by communion, which is "feeding a piece of bread that speaks to us of the body of Christ and drinking a cup of grape juice that speaks to us of the blood of Christ. It is the picture of the person and work of Christ." Only "members in good standing and those who feel that they are in good standing before the Lord, in their own consciences," and have been baptized may participate in communion. Following communion is "preaching of the word of God," then more singing, and then a coffee and bagel hour, where people frequently "engage in conversation and discussion and sometimes even counseling." Baptisms are performed on rare occasions. Finally, donations are collected by attendees placing money in a "nondescript gray [offering] box with a slit in the top of it."

The services are attended mostly by church members from the community, although they are open to all. Church membership is open to anyone who has been baptized, attends a membership class and demonstrates that he "believe[s] in the basic historic[al] Christian gospel." There are currently approximately forty-seven

---

1. The letter was copied to counsel.

members of the Church, and attendance at Sunday services ranges from 85 to 100 people. If the Church were permitted to use M.S. 206 for its Sunday services, it would use "a flyer to tell people where [to] meet."

At his deposition, Pastor Hall defined "worship services" as "ascrib[ing] worth, our supreme worth, to Jesus Christ." He distinguished the church from traditional clubs because it "engage[s] in the teaching and preaching of the word of God[, and it] administer[s] the sacraments of baptism and the Lord's supper." Thus, he also said that the church is not composed of "a group of people who have a common interest in the same way that stamp collecting and coin collecting bring people together." Indeed, Pastor Hall stated his belief that the church differs from a Bible study club or group because the latter groups do not "administer the sacraments of baptism and the Lord's supper." Finally, Pastor Hall noted that the church attaches no religious significance to a structure called a "church." Thus, it does not "build churches"; it builds "meeting houses." Therefore, anywhere the congregation of the Bronx Household of Faith meets for Sunday services is, in the church's view, a church.

## II.

I agree with the Majority's statement that, to prevail on their request for a mandatory preliminary injunction seeking to "stay government action taken in the public interest pursuant to a statutory or regulatory scheme," Plaintiffs must show a "clear" or "substantial" likelihood of success on their First Amendment claim. For the reasons set forth below, I find not only that Plaintiffs have fallen far short of carrying this heavy burden but also that their attempt to do so is barred by the doctrines of stare decisis, res judicata and collateral estoppel.[2]

### A.

As the Majority correctly observes, we are "tread[ing] on] familiar ground." In *Bronx Household of Faith v. Community School District No. 10*, 127 F.3d 207 (2d Cir.1997) (*"Bronx Household I"*), the same Plaintiffs that are currently before us challenged the constitutionality of the School Board's denial of their request to hold religious worship services at M.S. 206B. After concluding that M.S. 206B was a "limited public forum,"[3] *see id.* at 212–14, we turned to the question of whether "'the distinctions drawn [by the School Board were] reasonable in light of the purpose served by the forum and [were] viewpoint neutral,'" *id.* at 211–12 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund Inc.*, 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). We answered these questions in the affirmative, finding that it was reasonable "for a state and a school district to adopt legislation and regulations denying a church permission to use school premises for regular religious worship" and that it was "reasonable for state legislators and school authorities to avoid the identification of a middle school with a particular church." *Bronx Household I*, 127 F.3d at 214. With respect to viewpoint neutrality, we found

---

**2.** Because I find that Plaintiffs have failed to carry their burden of showing a clear or substantial likelihood of success on the merits, I do not address whether the District Court abused its discretion in concluding that Plaintiffs have made out a showing of irreparable harm.

**3.** There seems to be no serious question that M.S. 206B is a limited public forum. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829–30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

that "the regulation in question specifically permit[ted] any and all speech from a religious viewpoint" but that it did not "permit ... religious worship services," which had never been permitted to be conducted at the school. *Id.*[4] Subsequent to our decision, certiorari was sought and denied. *See* 523 U.S. 1074, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998).

## B.

Our decision in *Bronx Household I* thus presents Plaintiffs with several obstacles to overcome in making their showing of a clear or substantial likelihood of success on the merits of their First Amendment claim. First, Plaintiffs face the doctrine of stare decisis. "A decision of a panel of this [c]ourt is binding unless and until it is overruled by the [c]ourt *en banc* or by the Supreme Court." *Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995). Second, Plaintiffs must overcome the additional hurdles of res judicata and collateral estoppel. A claim bought in a subsequent proceeding is barred by the doctrine of res judicata if (i) the prior action involved an adjudication on the merits, (ii) the prior action involved the same parties or their privies and (iii) the claims asserted in the subsequent action were (or could have been) raised in the prior action, and by the doctrine of collateral estoppel if (a) the issues in both proceedings were identical, (b) the issue in the prior proceeding was actually litigated and actually decided, (c) there was a full and fair opportunity to litigate in the prior proceedings and (d) the issue previously litigated was necessary to support a valid and final judgment on the merits. *Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 644 (2d Cir. 1998). To overcome these hurdles, Plain-

tiffs rely on *Good News Club*—a case decided by the Supreme Court more than three years after our decision in *Bronx Household I*—which Plaintiffs argue effectively overruled *Bronx Household I.*

In *Good News Club,* a divided panel of this court rejected a Bible club's challenge brought under the Free Speech Clause to a school district's policy prohibiting the club from holding weekly meetings on school premises after hours, where the activities conducted at the meetings included singing hymns, prayer, memorizing scripture and Bible lessons. *See* 202 F.3d 502 (2d Cir.2000), *rev'd,* 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). While never characterizing these activities as religious worship services, my opinion for the majority found that it was constitutionally legitimate for the school district to draw a distinction between discussing secular subjects from a religious viewpoint and religious instruction. These activities, we held, did "not involve merely a religious perspective on the secular subject of morality." *Good News Club,* 202 F.3d at 510. Rather, they offered "children the opportunity to pray with adults, to recite biblical verse, and to declare themselves 'saved.'" *Id.*

Accepting that "these practices [were] necessary because [the Bible club's] viewpoint [was] that a relationship with God [was] necessary to make moral values meaningful," we nevertheless concluded that it was "clear from the conduct of the meetings that the [Bible club] [went] far beyond merely stating its viewpoint." *Id.* Instead, it was "focused on teaching children how to cultivate their relationship with God through Jesus Christ," and thus under, "even the most restrictive and archaic definitions of religion, such subject

---

**4.** We also rejected (over Judge Cabranes' partial dissent) Plaintiffs' constitutional attack against the School Board's prohibition of reli-

gious instruction. As discussed below, this part of our decision was overruled by the Supreme Court's decision in *Good News Club.*

matter [was] quintessentially religious." *Id.* Indeed, while characterizing the Bible club's activities as religious instruction instead of religious worship, we found it "difficult to see how the ... activities differ[ed] materially from" religious worship, for "each ha[d] prayers and devotional songs; each ha[d] a central sermon or story with a message; each ha[d] a portion in which attendees [were] called upon to be 'saved.'" *Id.* Accordingly, because "[a]pplying a different label to the same activities d[id] not change their nature or import," *id.,* we found the school board's restrictions to be permissible content-based restrictions rather than impermissible viewpoint-based restrictions. *Id.* at 511.

Judge Jacobs dissented, although he characterized his agreement with the majority as being "substantial." *Id.* (Jacobs, J., dissenting). Significantly, Judge Jacobs' view that the Bible club's "message [was] in fact the teach[ing of] morals from a religious perspective" was based on the fact that its "focus appear[ed] to be on teaching lessons for the living of a morally fit life, *and not on worship.*" *Id.* at 515 (internal quotation marks omitted and emphasis added).

The Supreme Court granted certiorari in *Good News Club* and reversed, rejecting the notion that "something that is 'quintessentially religious' or 'decidedly religious in nature' cannot also be characterized properly as the teaching of morals and character development from a particular view-

point." 533 U.S. 98, 111, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). What mattered for purposes of the Free Speech Clause, the Court stated, was that there was "no logical difference in kind between the invocation of Christianity by the [Bible club] and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons." *Id.* Thus, the Court rejected the notion that "any time religious instruction and prayer are used to discuss morals and character, the discussion is simply not a 'pure' discussion of those issues." *Id.* "[R]eliance on Christian principles," the Court continued, did not "taint[ ] moral and character instruction in a way that other foundations for thought or viewpoints do not." *Id.* Rather, the Court "reaffirm[ed]" the principle "that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." *Id.* at 111–12, 121 S.Ct. 2093. Thus, the Court concluded that the school district's exclusion of the Bible club from using the school to provide religious instruction constituted impermissible viewpoint discrimination. *Id.* at 112, 121 S.Ct. 2093.[5]

## C.

Our holding in *Bronx Household I* that religious worship services could be prohibited from being held in public school buildings without running afoul of the Free

---

5. I here note my understanding of the hierarchical nature of the Federal Court System and the need to follow Supreme Court precedent where it can be ascertained. I say this because the Supreme Court found my failure, as author of the subsequently reversed *Lamb's Chapel* case in our court, *see Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 959 F.2d 381 (2d Cir.1992), *rev'd,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), to cite *Lamb's Chapel* in the opinion for our court in

Good News Club, to be "particularly incredible." 533 U.S. at 109 n. 3, 121 S.Ct. 2093. I was quite aware of the *Lamb's Chapel* case and cited it extensively in *Bronx Household I,* which was in turn cited extensively in our court's *Good News Club* opinion. It seemed to me then that *Lamb's Chapel* just did not govern the evangelical activities described in *Good News Club.* The Supreme Court majority did find a similarity, and that is the law of the land, right or wrong.

Speech Clause remains good law, notwithstanding the Supreme Court's holding in *Good News Club* that constitutionally meaningful distinctions could not be drawn between religious and secular viewpoints in the context of religious instruction conducted in those same school buildings.[6] The Majority recognizes as much when it seeks to distance itself from the District Court's determinations that "religious worship cannot be treated as an inherently distinct type of activity, and that the distinction between worship and other types of religious speech cannot meaningfully be drawn by the courts." As the Majority correctly observes, these determinations "are in obvious tension with our previous holding that a permissible distinction may be drawn between religious worship and other forms of speech from a religious viewpoint ... a proposition that was ... not explicitly rejected in *Good News Club*." Thus, the Majority appears to concede that, if the activities conducted at Bronx Household of Faith meetings are inherently religious worship and nothing else, our decision in *Bronx Household I* would govern and this action would be dismissed on the grounds of res judicata and collateral estoppel.

In reaching its conclusion that Plaintiffs have shown a substantial or clear likelihood that they will succeed on the merits of their Free Speech Clause claim, the

Majority finds "no principled basis upon which to distinguish the activities set out by the Supreme Court in *Good News Club* from the activities that [Plaintiffs have] proposed for its Sunday meetings at [M.S.] 206B." In particular, the Majority concludes that these activities do not "constitute only religious worship, separate and apart from any teaching of moral values." For the reasons set forth below, I do not believe that such a conclusion can be supported on the present record. Indeed, my view of the record is that it supports the exact opposite conclusion.

Even though the Supreme Court's analysis in *Good News Club* was confined to religious instruction rather than religious worship services, the Majority attempts to extrapolate that analysis to the case at bar based on the Court's response to the characterization of the facts in *Good News Club* by Justice Souter in his dissenting opinion. In particular, Justice Souter opined that the Bible club "intend[ed] to use the public school premises not for the mere discussion of a subject from a particular, Christian point of view, but for an evangelical service of worship calling children to commit themselves in an act of Christian conversion." *Good News Club*, 533 U.S. at 138, 121 S.Ct. 2093 (Souter, J., dissenting).

The specific facts to which Justice Souter alluded were that the Bible club's meet-

---

6. The Majority seems to suggest that the vacatur and remand by the Supreme Court of the Fifth Circuit's decision in *Campbell v. St. Tammany's School Board*, 206 F.3d 482 (5th Cir.2000), *vacated and remanded*, 533 U.S. 913, 121 S.Ct. 2518, 150 L.Ed.2d 691 (2001), in light of *Good News Club* somehow demonstrates that the Court rejected our holding in *Bronx Household I* concerning religious worship services in public schools. But, in taking such action, the Court did not express its views on the merits of the Fifth Circuit's decision. In fact, the Court's decision to vacate and remand a lower court's decision in light of a recently decided case does not necessarily mean that the lower court's decision was incorrectly decided. Indeed, in several such cases, the Court has later declined to review the case notwithstanding the fact that the lower court did not change its conclusion on remand. *See, e.g., Carter v. Johnson*, 131 F.3d 452 (5th Cir.1997), *cert. denied*, 523 U.S. 1099, 118 S.Ct. 1567, 140 L.Ed.2d 801 (1998); *United States v. Stutson*, 128 F.3d 733 (11th Cir.1997) (mem.), *cert. denied*, 522 U.S. 1135, 118 S.Ct. 1094, 140 L.Ed.2d 150 (1998).

ings began and ended with a prayer and that "at the heart of the meeting" was the "'challenge' and 'invitation,'" which were "repeated at various times throughout the lesson" and which involved "saved children" being "challenged to stop and ask God for the strength and the want . . . to obey Him" and "unsaved children" being "invite[d] . . . to trust the Lord Jesus to be [their] Savior from sin, and receiv[e][him] as [their] Savior from sin." *Id.* at 137–38, 121 S.Ct. 2093 (internal quotation marks omitted). The *Good News Club* majority responded to Justice Souter in a footnote by characterizing his "recitation of the [Bible club's] activities" as "accurate," but it declined to characterize the Bible club's activities as "mere religious worship, divorced from any teaching of moral values." *Id.* at 112 n. 4, 121 S.Ct. 2093. What mattered, according to the *Good News Club* majority, was that the substance of the Bible club's activities involved conveying ideas from a religious viewpoint. *Id.*

Based on the interchange between Justice Souter and his colleagues, the Majority concludes that the "factual parallels between the activities described in *Good News Club* and the activities at issue" here justify its conclusion that there is a substantial or clear likelihood that Plaintiffs will prevail in showing that the School Board's prohibition against religious worship services in public schools constitutes viewpoint discrimination. To quote from Justice Souter's dissent in *Good News Club*, the activities at issue here make this case as different from *Good News Club* "as day from night." *Id.* at 137, 121 S.Ct. 2093 (Souter, J., dissenting).

Here, the "meeting" is led by a member of the clergy, who leads the attendees (largely made up of members of the church's congregation) in prayer and the singing of psalms, administers Communion only to those who have been baptized,

delivers a sermon from the pulpit and collects a religious offering from those present. To say that these activities are no different from secular meetings (such as a scouts meeting) where people eat, drink, sing, learn, socialize and engage in certain "rituals" like saluting the flag is to blink reality. As Judge Cabranes observed in *Bronx Household I*:

> Unlike religious "instruction," there is no real secular analogue to religious "services," such that a ban on religious services might pose a substantial threat of viewpoint discrimination between religion and secularism. Indeed, the dictionary definition of the term "services" in this context suggests as much: "a) public worship b) any religious ceremony . . . ." Because "services" are by definition religious in nature, it does not appear that they could ordinarily be understood to serve as a vehicle for both religious and secular viewpoints.

127 F.3d at 221 (Cabranes, J., concurring in part and dissenting in part) (quoting *Webster's New World Dictionary* 1226 (1994)); *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 306–07 & n. 19, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (in holding that student-led prayer at public school athletic events violated Establishment Clause, Court relied on definition of "invocation" in *Webster's Third New International Dictionary*, which defined the term to mean "a prayer of entreaty that is usual[ly] a call for the divine presence and is offered at the beginning of a meeting or service of worship"). Indeed, in the context of the Free Exercise Clause, the Supreme Court has held that worship services constitute the exercise of religion in pure form. *See Employment Div. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (" '[T]he exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling

with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation.").

I have no quarrel with the findings of the Majority that the School Board has authorized other groups, like the Boy Scouts and Girl Scouts, to teach morals and character development on school premises, that the School Board permits social, civic and other uses pertaining to the welfare of the community, and that therefore organizations or activities that undertake and promote speech from a religious viewpoint cannot be barred from school property. But I cannot abide the Majority's leap of logic that, based on Plaintiffs' self-serving statements that their "teaching comes from the viewpoint of the Bible" and their emphasis on the social and community aspects of the "meetings" of the church, their religious worship services are suddenly transformed into speech from a religious viewpoint. To do so would be no different from upholding the admissibility of a criminal defendant's confession made in the absence of a *Miranda* warning based solely upon the self-serving statements of the police that the defendant was not the subject of a custodial interrogation.

At bottom, based on the limited record before us, I find that the activities engaged in by Plaintiffs are religious worship services—nothing more and nothing less.[7] Accordingly, Plaintiffs have not met their burden of showing a clear or substantial likelihood that they will succeed on the merits of their Free Speech Clause claim, given our holding concerning religious worship in *Bronx Household of Faith I* and the Supreme Court's failure to disturb that holding in *Good News Club*. Conse-

quently, I find that the District Court abused its discretion in concluding otherwise.

### D.

Even if I found that the District Court did not abuse its discretion in determining that Plaintiffs had shown a likelihood of success on their Free Speech Clause Claim, I would still disagree with the Majority's conclusion that the School Board has not succeeded in demonstrating a likelihood that its prohibition against religious worship services being conducted in public schools was necessary to avoid a violation of the Establishment Clause. It cannot be gainsaid that a state has an interest in avoiding an Establishment Clause violation. *See Widmar v. Vincent*, 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (allowing use of university open forum for worship but noting "that the interest of the University in complying with its constitutional obligations may be characterized as compelling"). In concluding that there would be no Establishment Clause violation if Plaintiffs were permitted to hold religious worship services at M.S. 206B, the Majority again relies heavily on the Supreme Court's *Good News Club* decision. There, the Court rejected the school district's Establishment Clause defense to its ban on religious instruction in public school buildings. As the Majority correctly observes, in doing so, the Court emphasized that the religious instruction "was held after school hours, [was] not sponsored by the school, and [was] open to all students who obtained parental consent."

Once again, I believe the Majority misses the mark. In *Good News Club*, the

---

7. *See Oxford English Dictionary* 577 (2d ed.1989) (definition 8(a) of "worship": "Reverence or veneration paid to a being or power regarded as supernatural or divine; the action or practice of displaying this by appropriate acts, rites, or ceremonies").

Court concluded that the risk was low that the school district would be perceived as endorsing religion because a Bible club was one of many clubs that met at the school building to discuss its views. There was no significance to when the club wanted to hold its meetings. Here, of course, Plaintiffs have made it quite clear that they want to hold their religious worship services at M.S. 206B every Sunday morning because Sunday is "the Christian day of worship." Moreover, Plaintiffs have also made it clear that they will use flyers to advertise the fact that their religious services will be held on Sunday mornings at M.S. 206B and that they regard M.S. 206B as a "church" based on the fact that the school is where they are holding their services. Surely it cannot be gainsaid that there is a substantial risk that the School Board will be perceived as endorsing religion if flyers begin appearing in the neighborhood advertising that Bronx Household of Faith religious worship services will be held every Sunday morning at the group's new "church" located at M.S. 206B. *See Altman v. Bedford Cent. Sch. Dist.,* 245 F.3d 49, 75 (2d Cir.), *cert. denied,* 534 U.S. 827, 122 S.Ct. 68, 151 L.Ed.2d 34 (2001).

In addition to the above concerns relating to the perceived endorsement of religion by the School Board, I am also concerned that Plaintiffs' proposed activities will create significant risks of entanglement between the School Board and religious groups.[8] The School Board's first-come-first-serve policy of assigning space in public schools to groups that request it may work fine when the users are largely ambivalent about which day or night of the week they can be allocated space. But what will happen when other churches, synagogues and mosques in New York City follow Plaintiffs' lead and request use of school facilities during specific and limited time periods when these groups are required by their religions to worship and the supply of space is not sufficient to accommodate the demand? The quantity and quality of entanglement between school officials and religious groups in these circumstances goes well beyond what was involved in *Good News Club.* Accordingly, the use of a publicly financed building for private religious worship services, prohibited in New York through the democratic process,[9] simply runs afoul of the Establishment Clause.

### III.

I end with a response to the historical justifications for the Church–State merger accomplished in this case advanced by the Becket Fund for Religious Liberty in its amicus brief.[10] The Becket Fund apparently invokes the shade of Thomas Jeffer-

---

**8.** That the Majority shares this concern is demonstrated by the cataloging of issues "unresolved" by the Supreme Court and found in Part IV.A of the Majority Opinion. These issues speak to the need to adhere to our precedent until the Supreme Court speaks.

**9.** In a dispatch to the *New York Times* earlier this year, it was reported that a Justice of the Supreme Court gave a speech in which he noted, as is his wont, that the constitutional separation of church and state has not been correctly interpreted by his Court or by the lower courts. In response to a sign saying: "Get religion out of our government," carried by a demonstrator during the speech, the Jus-

tice is reported to have remarked: "I have no problem with that philosophy being adopted democratically." *See* N.Y. Times, Jan. 13, 2003, at A19. The exclusion of religious worship services from New York public school buildings *was* adopted democratically.

**10.** Amicus briefs were also filed on behalf of the New York State School Boards Association, Inc. and the United Federation of Teachers, as well as by the United States. It is surprising that the United States has taken the unusual position of filing an amicus brief supporting Plaintiffs in this court, especially given the current administration's policies favoring state and local control over education

son in its brief to justify the use of public buildings for church services because Jefferson is said to have attended services in the hall of the House of Representatives. As the author of the Virginia Statute of Religious Freedom, a strong supporter of popular sovereignty and states' rights, including the rights of nullification and secession, a critic of the Supreme Court's assumption of the power to declare state laws unconstitutional, and an Atheist (at least so considered by some), Jefferson lends little support to the position taken by the Becket Fund in this case.[11] Indeed, given that during Jefferson's lifetime the First Amendment applied only to the federal government and not the states, it seems strange to suggest that Jefferson would have countenanced (1) a federal court declaring unconstitutional a policy, (2) adopted pursuant to a state statute, (3) prohibiting worship services from being conducted on public school property.[12]

Absent from the Becket Fund's amicus brief is any recognition of the unbroken tradition of federal court deference in constitutional cases to democratically elected state and local governments in matters concerning education. *See, e.g., Dayton Bd. of Educ. v. Brinkman,* 433 U.S. 406, 410, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) ("[L]ocal autonomy of school districts is a vital national tradition."); *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 50, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (same).[13] It has been said that

[i]n pioneer times and during the era of the one-room country schoolhouse, before automobile transportation became commonly available, it probably was not at all unusual, in many rural and village areas, for the residents of the neighborhood to use the public schoolhouse as a meeting place for many community nonschool purposes, during nonschool time[, including] for holding Sunday church services or Sunday school meetings, or for evangelical or other religious meetings in the evenings, often because it was the only available building or hall in

and its aversion to "activist federal judges" who seek to substitute their judgment in the place of democratically elected state and local policymakers.

**11.** *See, e.g.,* Noble E. Cunningham, Jr., *In Pursuit of Reason: The Life of Thomas Jefferson* 55–58, 164–67, 217–19, 225 (1987); Stanley Elkins & Eric McKitrick, *The Age of Federalism: The Early American Republic, 1788–1800* at 197, 719–21 (1993); James F. Simon, *What Kind of Nation: Thomas Jefferson, John Marshall and the Epic Struggle to Create a United States* 21, 58–61, 285–88 (2002).

**12.** As for the attendance of John Quincy Adams at church services in the Supreme Court chambers, also invoked in the Becket Fund's amicus brief, suffice it to say that, like the hall of the House of Representatives, (1) no legislation excluded chambers from being used for services; (2) chambers was not a facility devoted to the public education of children, even in the time of John Quincy Adams; and (3) the period of use is unknown. Considering the present direction of Supreme

Court decisions in the area of church-state separation, however, *see, e.g., Zelman v. Simmons–Harris,* 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), we may once again see church services conducted in the Supreme Court courtroom.

**13.** *See also Missouri v. Jenkins,* 515 U.S. 70, 131–32, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (Thomas, J., concurring) ("We have long recognized that education is primarily a concern of local authorities.... Federal courts do not possess the capabilities of state and local school officials in addressing difficult educational problems. State and local school officials not only bear the responsibility for educational decisions, they also are better equipped than a single federal judge to make the day-to-day policy, curricular, and funding choices necessary to bring a school district into compliance with the Constitution."); *United States v. Lopez,* 514 U.S. 549, 580, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (Kennedy, J., concurring) ("It is well established that education is a traditional concern of the states.").

the community which could accommodate such a gathering.

C.T. Foster, Annotation, *Use of Public School Premises for Religious Purposes During Nonschool Time,* 79 A.L.R.2d 1148, 1150 (1961). However, such use was subject to a critical condition: that the "utilization of the public schoolhouse as a meeting place for religious services, outside of school time, where permitted by school authorities, generally was allowed *pursuant to common consent of the inhabitants of the region." Id.* (emphasis added) Here, the inhabitants of the State of New York have for decades withheld such consent.[14] Indeed, the fact that the policy in question here has been an affirmative policy of the State of New York for almost three quarters of a century also militates in favor of its constitutionality. *See Walz v. Tax Comm'n,* 397 U.S. 664, 678, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) ("Yet an unbroken practice of according [a tax] exemption to churches *openly and by affirmative state action, not covertly or by state inaction,* is not something to be lightly cast aside." (emphasis added)).

## IV.

I believe that Plaintiffs' claims are barred by collateral estoppel and res judicata, as well as stare decisis. I therefore disagree with my colleagues that Plaintiffs have made a clear or substantial showing of a likelihood of success on the merits. Accordingly, I would vacate the preliminary injunction and remand the case to the District Court with instructions to enter a judgment dismissing the action with prejudice.

---

**14.** Moreover, the present-day availability of meeting places is much greater than it was in pioneer days.